GALEN F. DULING, ADMINISTRATOR OF THE ESTATE OF NANCY MARIE DULING

*v.*

BLUEFIELD SANITARIUM, INC.

(No. 12346)

Submitted May 4, 1965.　　　　　Decided June 15, 1965.

568

*Weaver & Daugherty, W. C. Weaver, George A. Daugherty,* for appellant.

*Hudgins & Coulling, Paul S. Hudgins, L. R. Coulling, Jr.,* for appellee.

CALHOUN, JUDGE:

Galen F. Duling, as administrator of the estate of his deceased daughter, Nancy Marie Duling, instituted a wrongful death action against Bluefield Sanitarium, Inc., in the Circuit Court of Mercer County. Nancy Marie Duling died while a patient in the Bluefield Sanitarium, Inc. At the conclusion of the taking of the plaintiff's testimony, the trial court directed a verdict in favor of the defendant and from judgment entered on that verdict, the plaintiff has appealed to this Court.

Bluefield Sanitarium, Inc., is a private hospital. It is conceded, therefore, that this is not a case for application of the charitable immunity doctrine as defined in prior decisions of this Court. *Meade v. St. Francis Hospital,* 137 W. Va. 834, 74 S. E. 2d 405; *Koehler v. Ohio Valley General Hospital Association,* 137 W. Va. 764, 73 S. E. 2d 673; *Fisher v. Ohio Valley General Hospital Association,* 137 W. Va. 723, 73 S. E. 2d 667; *Roberts v. Ohio Valley General Hospital,* 98 W. Va. 476, 127 S. E. 318, 42 A. L. R. 968.

In the interest of further defining the questions presented for decision and narrowing their scope, we deem it pertinent to state that this is not a malpractice action against a physician. The competency of the attending physician and the professional skill employed by him in treating the patient were not questioned in the complaint or the proof of plaintiff's case. The case is based solely on alleged negligence of nurses employed by the defendant hospital, as distinguished from their lack of skill or competency in caring for or treating the patient.

At the time of her death in the defendant hospital, Nancy Marie Duling was thirteen years and eight months of age. Her father at that time was a member of the faculty of Concord College, which is located at Athens in Mercer County; and her mother was a teacher in the public school system. Nancy had a high intelligence quotient and until immediately prior to October 14, 1960, the date on which she was admitted to the defendant hospital as a patient, she had apparently enjoyed fairly normal health. On October 14, 1960, Dr. James Gatherum, a physician of Athens, was called to the Duling home to see Nancy in his professional capacity. Acting upon his advice, her parents took her in the afternoon of that day to the defendant hospital, where she was placed in the care of Dr. Henry F. Warden, Jr., a specialist in internal medicine.

Soon after the patient arrived at the hospital, Dr. Warden examined her in a preliminary sort of way, and, after she submitted to various tests at his direction, Dr. Warden saw her again in her private hospital room at approximately seven o'clock on the evening of the same day. Dr. Warden diagnosed her ailment as acute violent rheumatic fever with heart damage beginning. He told the mother that a special nurse would not be necessary and that she would be permitted to stay with the daughter in her room. The mother testified that Dr. Warden told her before he left the hospital at approximately seven o'clock that, if the patient should go into heart failure, she should have medical treatment immediately. The mother stayed with the patient until her death about one o'clock on the morning of October 16.

Before directing a verdict in favor of a defendant on the ground of the insufficiency of the plaintiff's proof, every reasonable inference favorable to the plaintiff fairly arising from the evidence, considered as a whole, should be entertained by the trial court and all facts should be assumed as established which the jury might properly find in favor of the plaintiff from the evidence. *Thornsbury* v. *Thornsbury*, 147 W. Va. 771, pt. 4 syl., 131 S. E. 2d 713; *Lambert et al.* v. *Goodman et al.*, 147 W. Va. 513, pt. 1 syl., 129 S. E. 2d 138; *Spaur* v. *Hayes*, 147 W. Va. 168, pt. 1 syl., 126 S. E. 2d 187; *Reilley* v. *Byard et al.*, 146 W. Va. 292, pt. 5 syl., 119 S. E. 2d 650.

Proof of the alleged negligence on part of the nurses is embodied primarily in the testimony of Florena E. Duling, the mother of the deceased girl. She testified that she decided to get in touch with one of the nurses shortly after Dr. Warden left the hospital at approximately 7 p. m.; that she stepped into the hallway and saw a nurse she believed to be the head nurse on the floor; that she later learned that this nurse was Mrs. Pate; that the mother identified herself and asked the nurse whether she might speak to her concerning the patient; that she told the nurse that the daughter had rheumatic fever and she asked the nurse if she would check Nancy frequently during the night; that she received no reply from the nurse as she continued to walk in the hallway; that no nurse had been in the room to check Nancy between four and seven o'clock, when Dr. Warden visited her; that the nurses' desk was immediately across the hallway from Nancy's room, a distance of about six steps; that by eight o'clock Nancy was coughing almost constantly; that the mother suggested to Mrs. Pate that a soft drink might cause Nancy's cough to abate, but that Mrs. Pate stated: "I have no way of getting soft drinks at this time in the evening for patients. If you want one, go downstairs to the machine and get it;" and that Mrs. Pate in her attitude was "very nasty," "grouchy," and "rude."

Mrs. Duling testified further that she was constantly endeavoring to reassure her daughter, who had become

quite apprehensive; that the mother meantime read to the daughter from the Bible and that she and the daughter discussed Christmas and possible gifts for the several members of the family; that the daughter developed a fever and could not stand bed covers on her; that meantime Mrs. Pate did not come into the patient's room or take her temperature, though the mother advised the nurse that Nancy apparently had a very high fever; that the mother had no means of testing the child's temperature; that the nurse authorized the mother to sponge the child's body with a wet towel; that by that time the child's heart "was beginning to pound" to such an extent that it shook the mattress of the bed; that by nine o'clock the mother noticed blueness of the child's nails which she reported to the nurse; that the nurse told the mother to go back and sit down; that the mother repeatedly requested the nurse to come into the room merely to check the child's condition, saying, "Please come and check my child;" that between nine and ten o'clock the mother pressed the button near the child's bed which caused a light outside the door as a signal for attention from a nurse; that after waiting about twenty minutes, no nurse had responded; that thereafter the mother went to the nurses' desk, called Mrs. Pate's attention to the signal light and informed her that Nancy had that which the mother believed to be "death rattles" but that no nurse or nurses' aide came into the room; that a nurses' aide appeared to be very sympathetic and stated that she would come in to check Nancy's condition if Mrs. Pate, the nurse, would allow her to do so; that during the evening two nurses passed the door with a juice cart; that the mother told the two nurses that Nancy was getting blue and implored them to come into the room to check Nancy, and that one of the nurses said Nancy would be checked by a nurse later; that about eleven o'clock a nurse came to the door and stated that Nancy was coughing so much that it would not be possible to take her temperature; that this nurse did not come into the room, despite the mother's earnest appeal to her to come into the room to check Nancy; that between nine and eleven o'clock, every ten to fifteen minutes, the mother requested one or more

nurses to come into the room to check Nancy; that Nancy meantime became so worried and apprehensive that the mother promised to move her to another hospital the next morning; and that the mother was hopeful that the situation would improve with a change of nurses at eleven o'clock and that in this respect she endeavored to reassure her daughter.

The mother testified further that about eleven o'clock Mrs. Pate was replaced by another nurse named Mrs. Sheets; that the mother made an earnest request to Mrs. Sheets to check the patient but that Mrs. Sheets replied: "I know all about Nancy. All she needs is a night's rest, and if you will sit down and be quiet she will get it;" that Nancy "was growing increasingly worse very fast;" that her nails showed blueness which was beginning to extend up above her nails, and that there was blueness around her mouth; that the mother requested Mrs. Sheets to call a doctor but that the nurse replied: "We can't call the doctor for no reason;" that Nancy requested the mother not to leave her room because she also was frightened; that the mother inquired of the nurse whether she might call a doctor and that Mrs. Sheets replied: "If any one calls the doctor from this hospital, we call him;" that about eleven o'clock the mother rushed into the hallway crying and stating: "My daughter is going to die. Nobody will come and help her;" that Mrs. Sheets then did call Dr. Warden; that the mother wanted the nurse to tell the doctor that the mother believed the child was in heart failure but that the nurse took the telephone to such a position that the mother could not hear what the nurse reported to the doctor; that, as a result of the telephone conversation and apparently on the advice of Dr. Warden, the nurse gave the child a hypodermic shot for her cough, but that the nurse made no check of the child's condition; that the mother noted a slightly bloody froth from the child's nose; that the blueness had crept up the child's fingers and had spread in a larger area around her mouth; that the mother rushed into the hallway and requested Mrs. Sheets to call Dr. Warden or some other doctor; that the nurse then called the resident physician, who prescribed cough syrup,

but that at that time Nancy could not swallow the cough syrup; and that the mother at this time was prepared to rush into the street for help but that, in going into the hallway crying, she found the office of the Supervisor of Nurses.

Mrs. Duling testified that she went into the office of the Supervisor of Nurses, Miss Lovern, who hurried to Nancy's room; that by that time Nancy appeared to be unconscious, gasping, unable to speak; that Miss Lovern promptly called Dr. Warden, who arrived in about ten minutes, between 12:45 and 1:00 o'clock on the morning of October 15; that upon arrival, Dr. Warden asked: "Why hasn't this child's bed been elevated? Don't you know it takes less heart power when the bed is elevated?" The mother testified that two or three nurses followed Dr. Warden into the room; that he stated: "How did this child get in this condition?" and that the mother replied: "Doctor, I'll tell you how she got in this condition. For four hours she has been in heart failure and nobody would come to look at her, much less do anything for her;" that immediately the patient was placed in an oxygen tent, her blood pressure was taken and her temperature was taken rectally; that within a few minutes Nancy apparently rallied; that the doctor advised that the child's father be called to be present promptly; that when he reached the hospital in the early morning of October 15, Dr. Warden stated that the child had been in heart failure during the night for a long period of time; that considerable heart damage had resulted; and that her heart was flabby like a dishrag. Mrs. Duling testified: "I have been in and out of hospitals many times in my life. Members of my family have been in and out of hospitals. We had never had such a thing to happen to us. I suppose I could not believe that it could happen in a hospital in America."

Galen F. Duling, father of the deceased child, accompanied the mother in taking Nancy to the hospital on October 14, but he returned to the home at Athens during the afternoon in order to be with Nancy's younger brothers. He returned to the hospital at the suggestion of Dr. Warden shortly

after one o'clock on the morning of October 15, after Dr. Warden discovered that the child's condition was critical. Thereafter special nurses attended Nancy until the time of her death. Mr. Duling was at the bedside of his daughter when she died shortly after one o'clock on the morning of October 16.

Dr. Kenneth Nathan Byrne, a physician of Point Pleasant, West Virginia, was offered as a witness for the plaintiff, but the court refused to permit his testimony to go to the jury on the ground that the court had directed counsel to exchange the names of witnesses at least ten days prior to the date of the trial and that counsel for the defendant were not advised that Dr. Byrne would be used as a witness for the plaintiff until a few days before the date set for the trial. His testimony was made a part of the record apart from the hearing of the jury. He testified that he had practiced his profession for eleven years at Welch in McDowell County, a county adjacent to Mercer County in which Bluefield is situated; that he was on the staff of Grace Hospital at Welch for five years and was superintendent and chief of staff at Welch Emergency Hospital in Welch for the following six years; that he left Welch and moved to Point Pleasant two months before the date on which he testified; that he was thoroughly familiar with practices and procedures relating to hospitals and nurses in the Bluefield area; that registered nurses follow rather standard procedures in accredited hospitals, wherever they may be located; that the delay of the nurses in calling a doctor definitely hastened the child's death; that if a member of the family of a hospital patient reports to a nurse that the condition of the patient apparently is becoming worse, the nursing staff should respond and investigate; and that a failure to do so constitutes a deviation from proper nursing standards.

When the trial court expressed his intention to exclude the testimony of Dr. Byrne, the judge offered to grant the plaintiff a continuance, but counsel for the plaintiff declined because they had in attendance a physician from New York to be used as a witness for the plaintiff at a

cost of $500.00 a day plus expenses. In these circumstances counsel for the plaintiff decided to proceed with the trial and to make Dr. Byrne's testimony a part of the record by avowal even though it was not permitted to be submitted to the jury.

At a pre-trial conference held on May 13, 1963, the court referred to a practice on the part of counsel which prevailed in that court of exchanging lists of the names of witnesses in advance of the trial date. The court suggested such an exchange "a few days before trial." Counsel for the defendant suggested an enlargement of that time and the court fixed the time at ten days. Apparently this was agreeable to counsel representing both parties. On the day set for trial of the case, counsel for the defendant objected to the use of Dr. Byrne as a witness for the plaintiff. As the reason for not giving notice at least ten days in advance that Dr. Byrne would be offered as a witness, counsel for the plaintiff stated that on Friday, November 29, 1963, counsel for the plaintiff received from counsel for the defendant a brief in support of the proposition that a physician could not testify concerning proper standards required of the defendant hospital and its nurses unless such doctor was acquainted with such standards in Bluefield and in the immediate area of that city; that thereupon counsel for plaintiff immediately commenced a search for a physician who was acquainted with such standards; that, through another attorney, they were advised that Dr. Byrne was acquainted with such standards and an interview was arranged with him on the following day, Saturday, November 30, 1963; and that one of counsel for the plaintiff promptly called one of counsel for the defendant by telephone during the afternoon of that day to give notice that Dr. Byrne would be offered as a witness for the plaintiff at the trial. Counsel for the plaintiff knew prior to November 29, 1963, that defense counsel would contend that, in order to be competent to testify, it would be necessary that a physician know of the standards in Bluefield and the immediately adjacent area and that the trial judge was inclined to that view. Such matters had been discussed at the pre-trial conference. It is contended in behalf of the

plaintiff that, in the circumstances, the trial court abused its discretion and committed reversible error in not permitting Dr. Byrne to testify as a witness before the jury.

Dr. David J. Graubard, a physician and surgeon of New York City, was called as an expert witness in behalf of the plaintiff. The trial court indicated that Dr. Graubard would not be permitted to testify before the jury. His testimony was, therefore, taken outside the presence and hearing of the jury. He testified that he had inspected the hospital record and chart and also an autopsy report in relation to Nancy Marie Duling; that he had read a discovery deposition made by Dr. Henry F. Warden, Jr.; that he had inspected an electrocardiogram taken on October 15; and that the hospital chart disclosed laxity and negligence on part of the nursing staff in caring for the patient according to Dr. Warden's orders and a failure to report to him definite critical changes which were taking place in the patient's condition.

Dr. Graubard gave answers to a hypothetical question which was amended from time to time to conform to the court's rulings and which, as finally amended, the court apparently believed to be substantially in proper form. In response to that question Dr. Graubard testified that Nancy's death was the result of the failure of the nurses to call Dr. Warden upon request of the mother, and that it was his opinion, to a reasonable degree of medical certainty, that the child's life could have been saved had the nurses performed their duties in a proper manner. One of his statements was as follows: "The failure of the nurses to get competent medical help when the child was going into heart failure allowed that heart which was already weakened to weaken further so that it was never able to fully recover its strength and so that the child could live." He testified further that if the child, at eight or nine o'clock on the night of October 14, had been given the proper supportive therapy that Dr. Warden ordered at one o'clock the next morning, "she would not have taxed her heart to a point where she was practically drowning in her own fluids up until the time Doctor Warden came

and then tried to rescue her." He testified further that the precedures followed by the nurses did not meet the normal standards of care.

The trial court excluded Dr. Graubard's testimony from consideration by the jury, apparently on the ground that the doctor was not familiar with standards of nurses and hospitals in the Bluefield area. A portion of the language of the trial judge in making that ruling was as follows: "I believe it's the test in the Bluefield and surrounding area. It might extend over to Princeton, but I doubt it. I believe it would be in the Bluefield area, and I don't believe I can permit the hypothetical question to go to the jury." Thereupon, counsel for the plaintiff moved the court to allow to go to the jury that part of Dr. Graubard's opinion which related to the inattention on part of the nurses being the proximate cause of the child's death. This motion was overruled. Counsel for the plaintiff then moved the court to admit the part of Dr. Graubard's testimony which embodied his professional opinion that the child's life could have been saved if the nurses had called Dr. Warden earlier. This motion was overruled and in that connection the trial judge stated: "Well, fundamentally—again, fundamentally and basically, it's based upon his testimony of care, the standard of care in accredited hospitals throughout the United States." Dr. Graubard's testimony therefore, was excluded in its entirety from consideration by the jury and this is assigned as an additional basis of reversible error.

Dr. Henry F. Warden, Jr., Nancy's attending physician, was called as a witness for the plaintiff. He testified that he is a specialist in internal medicine; that he practices his profession at the defendant hospital; that he is a member of the board of directors of the corporation which operates the defendant hospital; that he arrived at the hospital at approximately 12:45 a.m., on October 15, having been called by Miss Lovern about ten minutes earlier; that prior to that time he had last seen Nancy between seven and eight o'clock on the evening of October 14; that when Miss Lovern called him she stated that the child's con-

dition indicated that it was urgent that he come to the hospital; that when Mrs. Sheets called him earlier that night she reported that the patient's cough had increased and was not controlled by codeine, but that he did not recall that the nurse reported to him the mother's belief that the child was in heart failure; and that, if such had been reported to him, he would have requested that a nurse check the child.

Dr. Warden testified further that upon his arrival at the hospital he found that the child had dyspnea, which means shortness of breath; pulmonary edema, meaning a wet lung, manifested by shortness of breath; pink, blood-tinged, frothy sputum; a heart rate of one hundred sixty-two per minute; that she was cyanotic, which means blue-ness or an ashen color which is whitish blue and that he prescribed administration of oxygen to improve the venti-lation of the lungs. He testified that, when such symptoms appear, it is important to administer promptly the treat-ment he administered upon his arrival after midnight; and that when he arrived the cyanosis or blueness covered the child's entire body. He also testified that, upon his arrival after midnight, he elevated the hospital bed, placed the child in an oxygen tent and gave her a rapid-acting form of digitalis intravenously and a diuretic intravenously. He testified that if a nurse had called to tell him that the child's mother believed her child was in heart failure, he would have asked the nurse to check the patient and that if the nurse had confirmed the mother's belief, he would have gone to the hospital immediately.

Dr. Warden was asked a hypothetical question which basically assumed as true the mother's subsequent test-imony concerning her observations of the child's condition, and her report of such matters to the nurses from time to time, which hypothetical question concluded as follows: "In your hospital is it the proper standard of care that the nurse should go and personally check the child if she receives information such as that?" An objection was made by defense counsel. The court sustained the objection. The basic reason for the court's ruling was stated as follows:

"I don't understand that by calling a doctor as an adverse witness, you can make him an expert to prove your own case." At another point the court stated: "I don't understand you can make the doctor your own witness and prove your case by him by calling him as an adverse witness, and you are making him your medical expert." In the absence of the jury, in order to avouch the record, a similar hypothetical question was repeated to Dr. Warden and he made the following reply: "The standard of procedure for the nurses in the Bluefield Sanitarium would be to investigate these symptoms related to them and proceed accordingly—to what they find. If such symptoms or signs are confirmed upon their observation, a physician would be notified; not necessarily the attending physician; it may be the resident physician. If the symptoms were not verified, I think the nurse would use her own judgment." The doctor was then asked the following question: "And if the symptoms were verified and a doctor or a resident was not notified, then, doctor, that would be a deviation from the proper standard in your hospital, the Bluefield Sanitarium?" Doctor Warden replied: "It would be." The refusal of the court to permit the doctor's answers to the hypothetical questions to go to the jury is assigned as error. It will be noted that the hypothetical questions and the answers thereto related to standards of nurses, not of physicians.

Dr. Warden testified further that when there is a change in shifts of nurses, a report is given to the nurses coming on the new shift "with respect to every patient under their care." In response to a question by defense counsel, he stated that he could not have saved the child's life if he had been called earlier that night.

We are of the opinion that a basic error committed by the trial court was the application in this case of legal principles which are applied in medical malpractice actions. The trial court relied, in part at least, upon the following quotation from *Meadows* v. *McCullough et al.*, 101 W. Va. 103, 105, 132 S. E. 194, 195: "The issue is narrowed down to whether the defendant hospital gave and furnished to

the plaintiff such professional services while in such hospital, and necessary professional treatment, as was ordinarily furnished, and as implied in the contract at hospitals of like kind and character *in the same community* under like circumstances." (Italics supplied.) That case, however, involved a malpractice action against two physicians who were partners in the operation of the hospital. In the second point of the syllabus of *Schroeder* v. *Lonnie Adkins, Jr.,* 149 W. Va. 400, 141 S. E. 2d 352, a malpractice action against a chiropodist, the Court stated that, in the absence of a special contract to the contrary, the defendant was required to exercise only such reasonable and ordinary skill and diligence as are ordinarily exercised by the average of the members of the profession in good standing *"in similar localities* and in the same general line of practice, regard being had to the state of medical science at the time." (Italics supplied.) That is the most recent pronouncement by this Court on the subject.

We consider inapposite all the medical malpractice cases relied upon by counsel and by the trial court. This is not a medical malpractice action. Neither lack of skill nor unskillful treatment is charged against Dr. Warden or any other physician. The action is based solely on negligence and lack of due care on the part of nurses employed by the defendant hospital. In an action against a hospital for injuries sustained by a patient because of alleged negligence of nurses employed by the hospital, the standard of care required of the hospital has been stated as follows: "A private hospital, conducted for profit, owes to its patients such reasonable care and attention for their safety as their mental and physical condition, if known, may require. The care to be exercised should be commensurate with the known inability of the patient to take care of himself." *Danville Community Hospital, Inc.* v. *Thompson,* 186 Va. 746, 757, 43 S. E. 2d 882, 886, 173 A. L. R. 525. To the same effect see *Jefferson Hospital, Inc.* v. *Van Lear,* 186 Va. 74, 41 S. E. 2d 441; *Stuart Circle Hospital Corporation* v. *Curry,* 173 Va. 136, 3 S. E. 2d 153, 124 A. L. R. 176; *Tucker Sanatorium, Inc.* v. *Cohen,* 129 Va. 576, 106 S. E. 355, 22 A. L. R. 315. Other authorities stating the degree of care required

to patients by private hospitals are 26 Am. Jur., Hospitals and Asylums, Section 14, page 595; 22 A. L. R. 343; 124 A. L. R. 187; 11 A. L. R. 2d 778; 70 A. L. R. 2d 348; 72 A. L. R. 2d 409.

This Court has held that a charitable hospital may be liable in damages for injuries sustained by an invitee, as distinguished from a patient; and that the duty owed by the hospital to the invitee was a "duty to exercise ordinary care." *Koehler* v. *Ohio Valley General Hospital Association,* 137 W. Va. 764, pt. 1 syl., 73 S. E. 2d 673. A private hospital may be held liable for injuries sustained by a patient as a result of the mere negligence of a physician employed by the hospital, as distinguished from the physician's unskillful treatment of the patient. *Jenkins* v. *Charleston General Hospital & Training School,* 90 W. Va. 230, 110 S. E. 560.

*Hogan* v. *Clarksburg Hospital Company,* 63 W. Va. 84, 59 S. E. 943, involved a suit against the hospital for injuries sustained by the plaintiff while a patient in the hospital as the result of the alleged negligence or inattention on the part of nurses employed by the hospital. Counsel for the defendant relied upon authorities dealing with medical malpractice cases and apparently contended that the defendant hospital was required to bestow upon the patient such care, skill and diligence as other hospitals "in the same neighborhood." The Court, in distinguishing the two types of actions stated (63 W. Va. at page 87, 59 S. E. at page 944): "All the authorities cited are inapplicable to the case at bar. The question here does not arise as to the skill, care, and attention of any physician. The plaintiff had just been put into the hospital, and it does not appear from the evidence that he had yet received the attention of any physician. He had simply been received by the nurses and placed in a room. That which is complained of in this case is not the wrong or unskillful application of remedies but the neglect to give that *reasonable and ordinary care and attention* which was needed and due to plaintiff after being received into the hospital at the hands of the employees of the defendant." (Italics supplied.)

In medical malpractice cases, as distinguished from a case such as this, the general rule is that negligence or want of professional skill can be proved only by expert witnesses. *Schroeder* v. *Lonnie Adkins, Jr.,* 149 W. Va. 400, pt. 5 syl., 141 S. E. 2d 352; *Roberts* v. *Gale,* 149 W. Va. 166, pt. 2 syl., 139 S. E. 2d 272. Even in malpractice cases, however, the general rule has been qualified so as to permit negligence to be established without expert testimony in cases where negligence or want of skill is so obvious as to dispense with need for expert testimony. *Roberts* v. *Gale,* 149 W. Va. 166, 139 S. E. 2d 272, 276; *Buskirk* v. *Bucklew,* 115 W. Va. 424, 176 S. E. 603; *Howell* v. *Biggart,* 108 W. Va. 560, pt. 2 syl., 152 S. E. 323. It was proper for medical experts or other qualified persons to testify concerning customary standards and practices of accredited hospitals and of nurses employed by such hospitals and that such standards and practices are general in their application in accredited hospitals, irrespective of the city or community in which such hospitals are located; but we are of the opinion that, even in the absence of such testimony, the jury would have been warranted in this case in finding that the defendant hospital, through nurses employed by it, was negligent in the treatment of Nancy Marie Duling while she was a patient in that hospital. It was, of course, incumbent upon the plaintiff to establish a causal relationship between the negligence of the hospital and the death of the patient.

For reasons previously stated, we are of the opinion that the trial court erred in excluding in its entirety the testimony of Dr. David J. Graubard from consideration by the jury merely on the ground that he was not acquainted with the proper and usual standards of accredited hospitals in the Bluefield area and of nurses employed by such hospitals. In this connection we repeat that this case does not involve a medical malpractice action. The plaintiff did not question the skill, competency or the methods of treatment employed by Dr. Warden or any other physician. As a matter of fact, Dr. Graubard, as a witness for the plaintiff, testified that Dr. Warden, in his treatment of the patient, "did absolutely nothing wrong." We are of the

opinion also that it was proper for Dr. Graubard, in response to a proper hypothetical question, to state to the jury his opinion as an expert, to a reasonable degree of medical certainty, that the patient's death was caused by the failure of the nurses properly to attend the patient in response to the mother's repeated importunities and by their failure to summon a physician within a reasonable time; and that without such inattention and neglect on part of the nurses the patient's life could have been saved. The trial court erred in excluding the doctor's testimony to this effect.

Counsel for the defendant assert that the trial court properly refused to require Dr. Henry F. Warden, Jr., to answer before the jury a hypothetical question propounded to him by counsel for the plaintiff and in support of that contention the following cases are cited: *Ericksen* v. *Wilson,* 266 Minn. 401, 123 N. W. 2d 687; *Forthofer* v. *Arnold,* 60 Ohio App. 436, 21 N. E. 2d 869; *Hull* v. *Plume,* 131 N. J. L. 511, 37 A. 2d 53; *Hunder* v. *Rindlaub,* 61 N. D. 389, 237 N. W. 915; *Oleksiw* v. *Weidener,* 26 Ohio Op. 2d 414, 195 N. E. 2d 813; *Osborn* v. *Carey,* 24 Idaho 158, 132 P. 967. All these cases involved malpractice actions in which the defendants were called by the plaintiffs as witnesses, pursuant to statutes permitting one party to call the opposing party as a witness and to subject him to cross-examination. The cases are authority for the proposition that, in a malpractice action, a plaintiff may not call the defendant under the authority of statutes of that nature and, under the guise of cross-examination, compel him to give expert testimony to prove a case of malpractice. This is by no means a universal rule. See, for instance, *State, etc.* v. *Brainin,* 224 Md. 156, 167 A. 2d 117, 88 A. L. R. 2d 1178; *Lawless* v. *Calaway,* 24 Cal. 2d 81, 147 P. 2d 604; *McDermott* v. *Manhattan Eye, Ear & Throat Hospital,* 15 N. Y. 2d 20, 203 N. E. 2d 469. In connection with an annotation of the subject, the following appears in 88 A. L. R. 2d at page 1187: "* * * the trend appears to be toward a general rule recognizing the right to elicit expert testimony from an adverse party, although the number of jurisdictions on either side of the question is still roughly equal."

For various reasons we cannot agree with the contention of counsel for the defendant. R. C. P. 43 (b) is identical with its counterpart in the Federal Rules and is in part as follows: "A party may call an adverse party or an officer, *director,* or managing agent of a public or private corporation or association which is an adverse party, and interrogate him by leading questions and contradict and impeach him in all respects as if he had been called by the adverse party, * * *." (Italics supplied.) Dr. Warden is a director of the defendant hospital corporation. The action is not against him personally. It is not a malpractice action. The hypothetical question did not involve his opinion or knowledge as a medical expert, his competency as a physician or the propriety of his methods of treatment of the patient. The cases upon which defense counsel rely, therefore, are not in point.

The hypothetical question which the court declined to require Dr. Warden to answer related merely to proper standards of nurses in the defendant hospital. The court had ruled that testimony of this character could be given only by one acquainted with such standards in the Bluefield vicinity. It is difficult to imagine anybody who would be in a better position than Dr. Warden to know of such standards. In ruling upon the objection to the question, the trial court made the following statement: "And I am not depriving you of asking Doctor Warden about the standards of care of nurses over there, what would be done in certain particular instances; but what I am going to sustain objection to is making him your own medical expert." We are of the opinion that the trial court erred in making that ruling. We are not here concerned with the correctness of the form of the hypothetical question. We merely hold that the trial court erred in holding that Dr. Warden was not required to answer any proper question involving his expert knowledge or expert opinion as a member of the medical profession; and that, in any event, the hypothetical question related to Doctor Warden's knowledge of standards of nurses in the defendant hospital rather than to his knowledge or opinion as a medical expert. We are of the opinion that answers made by Doctor Warden

concerning standards of nurses in the defendant hospital should have been permitted to go to the jury, whether in response to proper hypothetical questions or otherwise.

The printed record, so far as we can determine, furnishes no information concerning the days during which the case was tried. The original transcript in the office of the clerk of this Court discloses that the case was tried on Monday, Tuesday and Wednesday, December 2, 3 and 4, 1963. Apparently no court order was entered on any of those days showing the proceedings in the trial of the case from day to day. On December 6, 1963, there was entered a brief order disclosing that there had been a trial of the case with a jury, a directed verdict and by that order judgment was entered on the verdict. Apparently no other order was entered to record the trial proceedings. On December 18, 1963, there was entered an order showing the action of the court in refusing to set aside the verdict and judgment. We have been unable to determine from any part of the record the date on which Dr. Kenneth N. Byrne testified. His testimony was preceded by the testimony of Dr. Graubard and Mrs. Duling. It seems obvious from the length of the testimony of Dr. Graubard and Mrs. Duling that Dr. Byrne testified comparatively late in the three-day trial. It appears, therefore, that a considerable period of time elapsed between the time counsel for defendant were first notified that Dr. Byrne would be used as a witness and the date he was actually offered as a witness. Defense counsel made an extended cross-examination of Dr. Byrne which appears to have been adequate to all proper purposes of the defense. The very nature of his testimony was such that it could not have embodied any great element of surprise. Bearing in mind that the basic purpose of a trial in court is the ascertainment of truth with the aid of all testimony which may properly contribute to that purpose, and, believing that the defense could have been put to no serious disadvantage by having Dr. Byrne's testimony go to the jury, we are of the opinion that the trial court abused its discretion in excluding Dr. Byrne's testimony from consideration by the jury.

It is asserted in behalf of the plaintiff that the trial court erred in ruling that a recovery of damages in excess of ten thousand dollars would not be warranted in this case. Inasmuch as the death occurred on October 16, 1960, the applicable statute is Code, 1931, 55-7-6, as amended and reenacted by Chapter 1, Acts of the Legislature, Regular Session, 1955. The statute as thus amended was construed in *Lester, Administrator* v. *Rose et al.,* 147 W. Va. 575, 130 S. E. 2d 80, and in *Stamper, Administrator* v. *Bannister,* 146 W. Va. 100, 118, S. E. 2d 313. After providing that, in a wrongful death action, a jury may give such damages as the jury may deem fair and just for the benefit of the distributees of the estate of the deceased, the statute, as amended, provides: *"Provided, however,* if the plaintiff in such action shall prove by a preponderance of the evidence financial or pecuniary loss sustained by a distributee or distributees of such deceased person in an amount exceeding the sum of ten thousand dollars the jury may give such damages as shall equal such financial or pecuniary loss, not exceeding twenty thousand dollars as the total of all damages recoverable in such action, * * *."

As we understand the contention of counsel for the plaintiff in their brief, they assert that "financial or pecuniary loss" sufficient to warrant a recovery in excess of ten thousand dollars may arise merely from the wrongful death, the loss of a human life. We are unable to agree with that construction of the statute. There is no evidence to indicate that the deceased girl had been gainfully employed, that she had any sort of earnings or other financial income or that she had any dependents. There was no proof of a loss of any sort except that inherent in and normally applicable to the loss by death of a loved one. Therefore, we hold that the trial court did not err in limiting the amount of any possible recovery to a maximum of ten thousand dollars.

Considering in its entirety the evidence adduced before the jury and the evidence improperly excluded by the trial court, we are of the opinion that the jury would have been justified in finding that the hospital was guilty of

actionable negligence, and that such negligence resulted in the death of Nancy Marie Duling. We are of the further opinion, therefore, that the trial court erred in directing a verdict for the defendant.

For reasons stated in this opinion, the judgment of the Circuit Court of Mercer County is reversed, the verdict is set aside, and the plaintiff is awarded a new trial.

*Judgment reversed;*
*verdict set aside;*
*new trial awarded.*