538 S.E.2d 719

**Ola Mae TAYLOR, Plaintiff Below, Appellant,**

v.

**CABELL HUNTINGTON HOSPITAL, INC., dba Cabell Huntington Hospital, A West Virginia Corporation, Linda G. Grim, Registered Nurse, and Edwin Porres, M.D., Defendants Below, Appellees.**

No. 27311.

Supreme Court of Appeals of West Virginia.

Submitted June 7, 2000.

Decided July 10, 2000.

Dissenting Opinion of Justice Starcher July 20, 2000.

Dwight J. Staples, Esq., Gail Henderson-Staples, Esq., Henderson, Henderson & Staples, Huntington, West Virginia, Attorneys for Appellant.

Rebecca C. Brown, Esq., Thomas L. Craig, Esq., Bailes, Craig & Yon, Huntington, West Virginia, Attorneys for Cabell Huntington Hospital and Linda Grim.

PER CURIAM:

Ola Mae Taylor, the appellant and plaintiff below in a medical malpractice case, appeals the final order of the Circuit Court of Cabell County entered January 28, 1999. The appellant raises four issues on appeal in support of her prayer for a new trial. After careful consideration of these issues, we affirm the judgment of the circuit court.

## I.

## FACTS

On July 28, 1994, the appellant, Ola Mae Taylor, sought treatment for a bee sting in the emergency room of defendant below and appellee Cabell Huntington Hospital (hereinafter "the hospital").[1] After examining the appellant, Dr. Edwin Porres ordered 125 milligrams of Solu–Medrol, a steroid, and 25 milligrams of Benadryl, an antihistamine, to be administered by intramuscular injection.[2] Defendant below and appellee Linda Grim (hereinafter "Nurse Grim"), a registered nurse employed by the hospital, combined the two medications in a single syringe and administered one injection to the appellant. Nurse Grim recorded on the appellant's chart that she injected the appellant in the "left upper outer quadrant buttock."

Several days later the appellant returned to the hospital's emergency room complaining of pain in her right hip which she attributed to the injection administered by Nurse Grim. After undergoing several medical tests, the appellant was diagnosed with piriformis syndrome, a condition named for the piriformis muscle, located in the buttock, and marked by pain in the hip and buttock that radiates up into the lower back and down the leg.[3]

---

1. The appellant was employed at the time as a housekeeper in the hospital's emergency room.

2. Solu–Medrol is a trademark for a glucocorticoid (methylprednisolone sodium succinate). Glucocorticoid is an adrenocortical steroid hormone that exerts an antiinflammatory effect. *Mosby's Medical & Nursing Dictionary* 491 and 1053 (2nd ed.1986). Benadryl is a trademark for an antihistaminic (diphenhydramine hydrochloride). An antihistamine is any substance capable of reducing the physiologic and pharmacologic effects of histamine, a compound released in allergic, inflammatory reactions. *Mosby's* at 74, 129, and 536.

3. *See Taber's Cyclopedic Medical Dictionary* 1480 (18th ed.1997). The syndrome was also described at trial as chronic irritation, spasm, or inflammation of the piriformis muscle which may be a source of constant irritation of the sciatic nerve.

On July 16, 1996, the appellant brought an action against Cabell Huntington Hospital, Dr. Porres,[4] and Nurse Grim in which she alleged negligence by injecting the appellant with Solu–Medrol and Benadryl in the same area of the body; injecting the appellant after the needle had fallen on the floor; and failure to supervise the administration of the injection by Nurse Grim. The appellant claimed that she had developed permanent hip and leg pain as a result of the alleged negligence.

At trial, contested issues were whether Nurse Grim injected the appellant in the right hip or left hip; whether the needle was capped or uncapped when it fell to the floor prior to the appellant's injection; and whether Solu–Medrol and Benadryl are incompatible medications which should not be combined in a single syringe. The primary issue was the compatibility of Solu–Medrol and Benadryl.[5] Essentially, the appellant's theory of the case was that the appellant injected her in the wrong location, in or near the piriformis muscle, with incompatible medications which resulted in a negative reaction and caused the appellant's injury.

Concerning the issue of compatibility, Dr. James O'Brien, a physician and pharmacologist testified for the appellant that the two medications are incompatible and that the injection of the combined medications was the proximate cause of the appellant's injury. Also, Gaynell Mischley, a registered nurse in the emergency room at the University of Tennessee testified that the medications are incompatible and that she has never observed the medications combined and injected in a single syringe.

Nurse Grim testified that she had previously administered Solu–Medrol and Benadryl in a single injection without complaint. She also testified that a nurse can determine whether two medications are compatible by combining them.[6] If the combination results in a clear solution, the medications are compatible. According to Nurse Grim, her combination of the two medications resulted in a clear solution. In addition, Nurse Grim stated that although the needle fell to the floor prior to the injection, it was capped so that no contamination resulted. Dr. Jay Jacoby, a physician and anesthesiologist, provided expert testimony that Solu–Medrol and Benadryl are not incompatible. He supported his testimony with a demonstration in which he combined the two medications to produce a clear solution. Dr. Lee Smith, an emergency medicine physician at West Virginia University and Linda Scott, a full professor and associate dean of the undergraduate nursing program at Marshall University, concurred with the opinion of Dr. Jacoby. The defendants also produced evidence that Nurse Grim injected the appellant with a one and one-half inch needle, and that a three and one-half inch needle would be required to inject the piriformis muscle.[7]

The jury found that the appellant's injury was not caused by Nurse Grim's negligence.

---

**4.** The circuit court granted summary judgment on behalf of Dr. Porres on May 6, 1998 because of the appellant's failure to produce a qualified expert witness to testify that Dr. Porres deviated from the acceptable standard of care and that any such deviation was a proximate cause of the appellant's alleged injury.

**5.** Because there was no medical evidence of infection, which the experts agreed would have been the result of injection with a contaminated needle, the issue of whether the needle was capped or uncapped when it fell to the floor was not significant. Also, the importance of the location of the injection was dependant upon showing that Solu–Medrol and Benadryl are incompatible solutions.

**6.** Expert witnesses agreed that physically incompatible medications turn cloudy when combined in contrast to the combination of compatible medications which results in a clear solution.

**7.** At trial the piriformis muscle was described as a muscle deep in the buttock. According to *Mosby's Medical and Nursing Dictionary* 885 (2nd ed.1986) the piriformis muscle is,

a flat, pyramidal muscle lying almost parallel with the posterior margin of the gluteus medius. It is partly within the pelvis and partly at the back of the hip joint. It arises from the sacrum, the greater sciatic foramen, and the sacrotuberous ligament, and it inserts, by a rounded tendon, into the greater trochanter of the femur. The piriformis is innervated by branches of the first and the second sacral nerves and functions to rotate the thigh laterally and to abduct and to help extend it.

## II.

### DISCUSSION

The first two issues raised by the appellant concern evidence which was excluded by the circuit court. This evidence was that from November 1992 until March 1993, Nurse Grim self-administered unprescribed morphine[8] which she acquired from the Intensive Care Unit of the hospital where she worked at that time. There was evidence that the morphine addiction began as a way to alleviate back pain with which Nurse Grim had suffered for about eight years. Upon being discovered and admitting her addiction in March 1993, Nurse Grim underwent twenty-eight days of inpatient treatment at River Park Hospital in Huntington and thereafter continued outpatient psychotherapy treatment. According to the provisions of a consent agreement subsequently executed by Nurse Grim and the West Virginia State Board of Examiners For Registered Professional Nurses, Nurse Grim's license was suspended for one year and the suspension stayed contingent upon Nurse Grim complying with the terms of the agreement. Also, Nurse Grim's license was placed on probation for a period of seven years. The terms of the agreement provided, *inter alia*, that Nurse Grim was not to work in an autonomous nursing position but was to work under the direct supervision of a registered professional nurse, and she was to submit to unannounced, witnessed drug-screening tests.

At a hearing on the defendants' motion in limine to exclude this evidence at trial, Dr. Robert Allen Kaiser, Nurse Grim's treating psychiatrist from March 1993 until 1997 when she completed her therapy, testified

that, in his opinion, Nurse Grim did not abuse narcotics[9] on or around July 28, 1994. Nurse Grim testified that she last used morphine in March 1993, and that she was not under its influence when she treated the appellant.[10] The defendants also produced the results of thirty-eight drug tests conducted on Nurse Grim, all of which were negative for substance abuse.

Evidence presented by the appellant showed that no drug tests were conducted on Nurse Grim from July 7, 1994 through August 8, 1994. The appellant opined that because the human body metabolizes morphine within twenty-four hours, if Nurse Grim was under the influence of morphine on July 28, 1994, it would not be indicated in the August 8 drug test results. Also, the appellant testified at trial that prior to injecting her on July 28, 1994, Nurse Grim initially mistook the appellant's friend for the patient who required an injection. The appellant further stated that Nurse Grim acted "real happy" or "weird" while treating her.

### Issue One: Exclusion of Evidence Relating to Consent Agreement

The appellant sought to have evidence of the consent agreement, Nurse Grim's probation, and the hospital's duty to supervise Nurse Grim admitted at trial to support a "negligent supervision" claim against the hospital, and now alleges that the circuit court improperly "dismissed the claim of negligence against Cabell Huntington Hospital" by excluding this evidence. The negligent supervision claim is based on the theory that the hospital breached its duty, imposed by the consent agreement, to supervise Nurse Grim.[11]

---

8. According to *Taber's Cyclopedic Medical Dictionary* 1234 (18th ed.1997), morphine sulfate is the form of morphine usually used as an analgesic, or pain reliever, and sedative. *See also Mosby's Medical & Nursing Dictionary* 730 (2nd ed.1986).

9. *Tabor's Cyclopedic Medical Dictionary* 1267 defines "narcotic" as "[p]roducing stupor or sleep." Also, it is "[a]n older term for a drug that depresses the central nervous system, thus relieving pain and producing sleep." The newer term is opioid analgesic. Morphine is a narcotic. *See* note 7.

10. Nurse Grim further testified that narcotics are not available to her in the emergency room be-

cause of that department's use of the Sure–Med System to dispense drugs. According to Nurse Grim, nurses can only retrieve medicine from the system by means of a personal access code.

11. To support its negligent supervision theory, the appellant cites *Duling v. Bluefield Sanitarium, Inc.*, 149 W.Va. 567, 142 S.E.2d 754 (1965), *Roberts v. Stevens Clinic Hospital, Inc.*, 176 W.Va. 492, 345 S.E.2d 791 (1986), and *Torrence v. Kusminsky*, 185 W.Va. 734, 408 S.E.2d 684 (1991). Syllabus Point 3 of *Duling* provides that "[a] private hospital may be held liable in damages for the death of a patient in such hospital resulting from the negligence of nurses employed

The appellant's purpose in bringing a negligent supervision claim is not clear to this Court. Cabell Huntington Hospital was a named defendant in the action below and remained so throughout the proceedings despite the allegation of the appellant to the contrary. Counsel for the hospital acknowledged that if the jury found that a negligent act of Nurse Grim caused the appellant's injury, the hospital would be liable under the doctrine of *respondeat superior*.[12] The circuit court instructed the jury that if it found that Nurse Grim committed negligence, the jury may also render a verdict against the hospital. Finally, appellant's counsel argued to the jury that the hospital would be liable for damages caused by Nurse Grim's negligence. Nevertheless, the appellant sought to establish the hospital's liability by proving negligent supervision. The appellant now argues that the doctrine of *respondeat superior* does not preclude other causes of action against an employer.

■■■ Because of the verdict in this case, we need not consider the viability of a negligent supervision claim in cases governed by the doctrine of *respondeat superior*. The appellant's claim of negligent supervision must rest upon a showing that the hospital failed to properly supervise Nurse Grim and, as a result, Nurse Grim committed a negligent act which proximately caused the appellant's injury. "To recover in an action based on negligence the plaintiff must prove that the defendant was guilty of primary negligence and that such negligence was the proximate cause of the injury for which the plaintiff seeks a recovery of damages." Syllabus point 2, *Tolliver v. Shumate*, 151 W.Va. 105, 150 S.E.2d 579 (1966). While the appellant may be able to show that the hospital breached its duty to supervise Nurse Grim, absent a showing of negligence by Nurse Grim, the appellant is unable to show that the hospital's negligence proximately caused her injury. Accordingly, because the jury found that Nurse Grim's negligence did not cause the appellant's injury, we find the issue of alleged negligent supervision to be moot.[13]

### Issue Two: Exclusion of Chemical Dependency Evidence

Next, the appellant argues that the circuit court erred when it excluded evidence regarding Nurse Grim's chemical dependency without performing the mandated Rule 404(b) analysis.[14] In considering this issue,

by it." When applied to the instant case, this means that had the jury found that Nurse Grim was negligent and her negligence was a proximate cause of the appellant's injury, Cabell Huntington Hospital would have been liable. *Roberts* and *Torrence* are inapposite to the present case because they concern the negligent acts of independent contractors rather than employees of a hospital.

12. According to *Black's Law Dictionary* 1311 (6th ed.1990), "[t]his doctrine or maxim means that a master is liable in certain cases for the wrongful acts of his servant" or employee. "The fundamental rule in West Virginia is that if it can be shown that an individual is an agent and if he is acting within the scope of his employment when he commits a tort, then the principal is liable for the tort as well as the agent." *Barath v. Performance Trucking Co., Inc.*, 188 W.Va. 367, 370, 424 S.E.2d 602, 605 (1992). It is uncontroverted that Nurse Grim was an employee of Cabell Huntington Hospital and was acting within the scope of her employment when she treated the appellant.

13. The appellant also alleges that it was improper for the trial judge to absent himself from the courtroom during vouching of the record by appellant's expert witness. Our review of the trial transcript reveals, however, that appellant's counsel failed to object at the time the trial judge indicated that he would be absent. "Our general rule is that nonjurisdictional questions not raised at the circuit court level, but raised for the first time on appeal, will not be considered." *Barney v. Auvil*, 195 W.Va. 733, 741, 466 S.E.2d 801, 809 (1995) (citations omitted). Therefore, we decline to address this issue.

14. According to Rule 404(b) of the *West Virginia Rules of Evidence*, in part:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, accident[.]

The appellant argues that the evidence of prior substance abuse should have been admitted at trial to show that the hospital had knowledge of Nurse Grim's prior drug usage, consent agreement, and working conditions; to show that the hospital had a duty to supervise Nurse Grim and failed in this duty; to show motive on the part of Nurse Grim to abuse drugs based on her conduct on July 28, 1994, her past conduct, and her

we are mindful that, "[r]ulings on the admissibility of evidence are largely within a trial court's sound discretion and should not be disturbed unless there has been an abuse of discretion." Syllabus point 2, *State v. Peyatt*, 173 W.Va. 317, 315 S.E.2d 574 (1983).

The appellant argues that the evidence at issue is admissible under Rule 404(b) of the West Virginia Rules of Evidence, and that the circuit court failed to conduct the required Rule 404(b) analysis prior to excluding the evidence. This Court has stated:

> Where an offer of evidence is made under Rule 404(b) of the West Virginia Rules of Evidence, the trial court, pursuant to Rule 104(a) of the West Virginia Rules of Evidence, is to determine its admissibility. Before admitting the evidence, the trial court should conduct an *in camera* hearing as stated in *State v. Dolin*, 176 W.Va. 688, 347 S.E.2d 208 (1986). After hearing the evidence and arguments of counsel, the trial court must be satisfied by a preponderance of the evidence that the acts or conduct occurred and that the defendant committed the acts. If the trial court does not find by a preponderance of the evidence that the acts or conduct was committed or that the defendant was the actor, the evidence should be excluded under Rule 404(b). If a sufficient showing has been made, the trial court must then determine the relevancy of the evidence under Rules 401 and 402 of the West Virginia Rules of Evidence and conduct the balancing required under Rule 403 of the West Virginia Rules of Evidence. If the trial court is then satisfied that the Rule 404(b) evidence is admissible, it should instruct the jury on the limited purpose for which such evidence has been admitted. A limiting instruction should be given at the time the evidence is offered, and we recommend that it be repeated in the trial court's general charge to the jury at the conclusion of the evidence.

Syllabus Point 2, *State v. McGinnis*, 193 W.Va. 147, 455 S.E.2d 516 (1994), *see also*, Syllabus Point 2, *Stafford v. Rocky Hollow Coal Co.*, 198 W.Va. 593, 482 S.E.2d 210 (1996).

Under this analysis, the trial court must first find by a preponderance of the evidence that the prior acts actually occurred. In the instant case, the defendant admitted her prior morphine addiction. The next step is that the trial court must determine the relevancy of the evidence under Rules 401 and 402. "The threshold inquiry the court must make before admitting similar acts evidence under Rule 404(b) is whether that evidence is probative of a material issue other than character." Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers*, Vol. 1, § 4–5(B)(3)(a), p. 332 (1994) (citations omitted). Only if the evidence is found to be relevant is the balancing required under Rule 403 to be conducted.

The circuit court held an *in camera* hearing on the admissibility of evidence of Nurse Grim's prior morphine addiction and determined that the evidence was not relevant to whether Nurse Grim negligently combined two incompatible drugs on July 28, 1994. We agree. " ' "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' W.Va.R.Evid. 401." Syllabus Point 2, *State v. Maynard*, 183 W.Va. 1, 393 S.E.2d 221 (1990). The evidence in the instant case was undisputed that Nurse Grim gave the appellant a single injection of a combination of Solu–Medrol and Benadryl. The primary issue was whether Solu–Medrol and Benadryl are incompatible medications so that their combination in a single injection caused a negative reaction which resulted in injury to the appellant. Evidence concerning Nurse Grim's prior substance abuse does not have any tendency to make the incompatibility of Solu–Medrol and Benadryl more or less probable. Accordingly, we conclude that the circuit court did not abuse its discretion in

mental health records; to show Nurse Grim's opportunity to abuse drugs; to show that Nurse Grim failed to act as a nurse within the minimal-

ly acceptable standards of care at the time she treated the appellant; and to rebut the credibility of the defendants and their witnesses.

excluding evidence of Nurse Grim's prior substance abuse.

### Issue Three: Improper Admission of Linda Scott's Testimony

Third, the appellant avers that the circuit court erred in allowing the defendants' nursing witness, Linda Scott, to testify as an expert because her opinions were not testified to with reasonable medical probability as required by W.Va.Code § 55–7B–7 (1986). The appellant argues that the circuit court should have either stricken the testimony or instructed the jury that it should not be considered expert testimony. Concerning our standard of reviewing this alleged error, we have opined that "[w]hether a witness is qualified to state an opinion is a matter which rests within the discretion of the trial court and its ruling on that point will not ordinarily be disturbed unless it clearly appears that its discretion has been abused." Syllabus Point 5, *Overton v. Fields,* 145 W.Va. 797, 117 S.E.2d 598 (1960).

Linda Scott testified that it is not below the standard of care of a nurse to inject a patient with a needle that had fallen on the floor while capped, and that Solu–Medrol and Benadryl are not incompatible medications. She did not expressly testify to these opinions with reasonable medical probability which is a requirement of W.Va.Code § 55–7B–7. We do not believe, however, that W.Va.Code § 55–7B–7 governs Ms. Scott's testimony. First, this statute applies specifically to the manner in which plaintiffs in medical malpractice actions shall establish the applicable standard of care and defendants' failure to meet that standard. In the instant case, Ms. Scott was testifying on behalf of the defendants. Second, the statute also requires that the expert witness maintain a current license to practice medicine in one of the states of the United States. If we were to apply this statute in the strict way urged by the appellant, Ms. Scott's expert testimony would be excluded, as well as the testimony of Gaynell Mischley, the appellant's nursing expert, because Ms. Scott and Ms. Mischley are not licensed to practice medicine.

The admissibility of Ms. Scott's expert testimony is governed instead by Rule 702 of the West Virginia Rules of Evidence which states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

This Court has held:

> Rule 702 of the *West Virginia Rules of Evidence* is the paramount authority for determining whether or not an expert is qualified to give an opinion. Therefore, to the extent that *Gilman v. Choi,* 185 W.Va. 177, 406 S.E.2d 200 (1990) indicates that the legislature may by statute determine when an expert is qualified to state an opinion, it is overruled.

Syllabus Point 6, *Mayhorn v. Logan Medical Foundation,* 193 W.Va. 42, 454 S.E.2d 87 (1994). "Rule 702 has three major requirements: (1) the witness must be an expert; (2) the expert must testify to scientific, technical or specialized knowledge; and (3) the expert testimony must assist the trier of fact." *Gentry v. Mangum,* 195 W.Va. 512, 524, 466 S.E.2d 171, 183 (1995).

Applying this standard to the case at hand, we believe that the circuit court did not abuse its discretion in admitting the expert testimony of Ms. Scott. The record reveals that Ms. Scott has a master's degree in nursing and a Ph.D. in medical anthropology. She is board certified in emergency nursing and is a full professor and associate dean of the undergraduate nursing program at Marshall University. Therefore, Ms. Scott qualifies as an expert in standard nursing practices. Ms. Scott testified to the standard of care and proper method in which to administer the type of intramuscular injection involved in this case which is certainly specialized knowledge. Finally, this testimony assisted the jury in determining whether Nurse Grim was negligent in the manner in which she injected the appellant. We therefore conclude that the circuit court did not abuse its discretion in admitting the expert testimony of Ms. Scott.

*Issue Four: Proffered Jury Instruction*

██ Finally, the appellant asserts that the circuit court erred in failing to give her proffered jury instruction concerning the definition of "registered professional nursing" found in W.Va.Code § 30–7–1(b) (1992).[15] It is the appellant's position that the jury could not determine the appropriate standard of care absent the proffered instruction.

██ In reviewing this alleged error we are mindful that "[a]s a general rule, the refusal to give a requested jury instruction is reviewed for an abuse of discretion. By contrast, the question of whether a jury was properly instructed is a question of law, and the review is *de novo.*" Syllabus point 1, *State v. Hinkle,* 200 W.Va. 280, 489 S.E.2d 257 (1996). Also,

[a] trial court's instructions to the jury must be a correct statement of the law and supported by the evidence. Jury instructions are reviewed by determining whether the charge, reviewed as a whole, sufficiently instructed the jury so they understood the issues involved and were not mislead by the law. A jury instruction cannot be dissected on appeal; instead, the entire instruction is looked at when determining its accuracy. A trial court, therefore, has broad discretion in formulating its charge to the jury, so long as the charge accurately reflects the law. Deference is given to a trial court's discretion concerning the specific wording of the instruction, and the precise extent and character of any specific instruction will be reviewed only for an abuse of discretion.

Syllabus point 4, *State v. Guthrie,* 194 W.Va. 657, 461 S.E.2d 163 (1995). Finally,

[t]he formulation of jury instructions is within the broad discretion of a circuit court, and a circuit court's giving of an instruction is reviewed under an abuse of

discretion standard. A verdict should not be disturbed based on the formulation of the language of the jury instructions so long as the instructions given as a whole are accurate and fair to both parties.

Syllabus point 6, *Tennant v. Marion Health Care Foundation,* 194 W.Va. 97, 459 S.E.2d 374 (1995).

Concerning the standard of care applicable to Nurse Grim, the circuit court instructed the jury as follows:

For the plaintiff to recover from Linda Grim on her claim, she must prove by a preponderance of the evidence: One, that Linda Grim is negligent; and, two, that her negligence was a proximate cause of Ola Mae Taylor's injury.

Throughout these instructions, I will be using the term health care provider. That term applies to the defendant, Linda Grim, who is considered to be a health care provider. When you hear the term health care provider in these instructions, you should think of the defendant and apply that term individually.

I want to tell you about the standard of care expected of the health care provider. The standard of care is important because in order for the plaintiff to prove negligence, she must establish, one, the degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in same or similar circumstances; and, two, that the health care provider deviated from that standard; and, three, that the deviation was the proximate cause of the injury.

\*   \*   \*   \*   \*   \*

A health care provider is not required to exercise the highest degree of skill and diligence possible in the treatment of an

---

15. W.Va.Code § 30–7–1(b) provides:

The practice of "registered professional nursing" shall mean the performance for compensation of any service requiring substantial specialized judgment and skill based on knowledge and application of principles of nursing derived from the biological, physical and social sciences, such as responsible supervision of a patient requiring skill in observation of symptoms and reactions and the accurate recording of the facts, or the supervision and teaching of other persons with respect to such principles of nursing, or in the administration of medications and treatments as prescribed by a licensed physician or a licensed dentist, or the application of such nursing procedures as involve understanding of cause and effect in order to safeguard life and health of a patient and others[.]

injury, but is required to possess and exercise that degree of learning, skill, diligence and care ordinarily used and possessed by a health care provider in good standing in the profession or class to which they belong, acting in the same or similar circumstances in 1994, with regard being given to the state of medical and nursing science at that time.

We believe that this charge sufficiently instructed the jury so that the jurors properly understood the standard of care required of Nurse Grim. We further believe that, as a whole, it is accurate and fair to both parties. Accordingly, we conclude that the circuit court did not abuse its discretion in refusing the appellant's proffered instruction and giving the above instruction instead.

### III.

### CONCLUSION

In sum, for the reasons stated above, we believe that the circuit court did not abuse its discretion in excluding evidence of Nurse Grim's prior conduct and the consent agreement, and in admitting Linda Scott's expert testimony. We also conclude that the circuit court did not err in refusing to give appellant's proffered instruction concerning the statutory definition of a registered professional nurse. Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

Justice McGRAW dissents.

STARCHER, Justice, dissenting:

(Filed July 20, 2000)

I dissent to the majority opinion's refusal to allow the plaintiff to present to the jury evidence regarding defendant Linda Grim's morphine addiction, and evidence that she had been disciplined for her addiction, and was working pursuant to a consent agreement on the day that Ms. Taylor received her injuries in the hospital. The plaintiff presented evidence suggesting that Nurse Grim was acting unusual and confused when she gave Ms. Taylor a shot of Benadryl and Solu–Medrol. There was evidence that Nurse Grim even tried to give a person other than the plaintiff the shot. The nurse dropped the needle on the floor before giving the shot, and the plaintiff contends the needle was uncapped when this occurred. The nurse also wrote in the plaintiff's chart that she administered the shot to the left buttock—the plaintiff contends that the drugs were injected in her right buttock. There was also controversy as to whether the nurse improperly mixed the two drugs.

Nurse Grim at some time during her career had abused morphine for 6 to 8 years, and did so around patients. An expert witness testified that her actions around the plaintiff at the time of the plaintiff's injury were consistent with someone who was actually using morphine. We know that there was some truth to Nurse Grim's habit because Nurse Grim, the West Virginia State Board of Examiners for Registered Professional Nurses, and Cabell Huntington Hospital had entered into a consent agreement such that the Hospital would not allow Nurse Grim to work in an "autonomous nursing position" and that she would work "only under the direct supervision of a Registered Professional Nurse in a structured setting." Nurse Grim was working alone at the time she injected the plaintiff.

If this had been a criminal case, the majority would have held the evidence of Nurse Grim's past actions as admissible under *W.V.R.E.* Rule 404(b) faster than a New York minute. But since this is a civil case, where only compensation to an injured hospital patron and not the conviction of a criminal defendant is on the line, the majority opinion gives the evidence a protracted relevancy analysis. The majority concludes that past evidence of drug use by the defendant on the job is not indicative of current drug use.

I believe that the jury had the right to weigh *all* of the evidence, including whether the defendant was under the effect of drugs. Certainly, the jury was entitled to know that Nurse Grim was working under a disciplinary consent agreement, and that she was working unsupervised in violation of the agreement.

I therefore dissent.