KETTLE *v.* R. J. LOOCK & COMPANY ET AL.

[No. 66, October Term, 1951.]

*Decided January 11, 1952.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*John Brockenbrough Fox,* with whom was *David Friedman* on the brief, for the appellant.

*John A. Cochran,* with whom were *A. Frederick Taylor* and *Allers & Cochran* on the brief, for the appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal from a judgment for costs in favor of the defendant, appellee, R. J. Loock and Company, Inc., (Loock). The case was tried by the trial judge without a jury.

Charles O. Kettle, plaintiff, appellant, was engaged in the business of transporting sea food between Baltimore and Boston and operated a small fleet of tractors and trailers for that purpose. He testified that he stored his trucks on the lot of Samuel Jones from whom he bought gasoline. Sam Jones also did his mechanical work and as a result Jones allowed him to keep his trucks on his lot. In February 1950, Mr. Kettle said he took two tractors to Sam Jones to be overhauled and shortly thereafter the two tractors broke down due to extensive damage to the engines.

On June 9, 1950, the appellant filed an amended declaration against Loock, claiming that at the request of Sam Jones, the appellee took the engine heads "to its place of business in order to overhaul the same and replace such valves and parts therein as may need replacement to the end and intent that the said engine heads would be in correct mechanical running order. That the valves in said engine head were properly supposed to be Brockway valves * * *. * * * the said tractors did break down due to extensive damage to the engines which, upon examination, was revealed to have been caused by the carelessness and negligence of the defendant in that the said Defendant did contrary to specification install valves other than those recommended by the manufacturer and further, did improperly adjust and did install the exhaust and intake valve caps in the wrong places so that the exhaust valve caps were placed where the intake valve caps should have been placed, as a result of all of which the valves did collapse and break with resultant extensive damage to the engines." The appellant claimed $10,000.00 damages.

The appellee impleaded Samuel Jones, trading as Sam Jones Tydol Service, as a third party defendant. However, the appellant did not declare against this third party defendant. The trial judge found a verdict for the appellee and for the third party defendant for costs. The appellant appeals from the judgment for costs in favor of Loock.

The trial judge in his opinion stated, among other things: "Regardless of what may be thought to be the form of action here, the plaintiff seeks to recover from the defendant R. J. Loock and Company, Inc., because of breach of duty of some kind, or negligence. I notice that pleas have been filed in the alternative, consisting of general issue pleas in breach of contract and tort. In any event, the plaintiff here has the burden of proving the breach of duty or lack of care which caused the engine failure. Regardless of what his opinion may be, the only expert opinion offered on behalf

of the plaintiff is that of Mr. Rook, and all he can say about it is that it is pretty hard to tell what the mechanical cause was. As opposed to that, the opinions of Mr. Brezina and of Mr. Scranton, both formed after very minute and careful examinations and laboratory tests, exclude any breach of duty or lack of care on the part of Loock and Company. I am forced to conclude that the plaintiff has failed to make out a case against R. J. Loock and Company, Inc., and, for that reason, judgment must be in favor of the defendant."

The appellant claims that this opinion of the trial judge was not an opinion within the contemplation of Part Three, III, Trials, Rule 9 (General Rules of Practice and Procedure) so as to be the basis for entry of a valid judgment. Rule 9, *supra,* provides: "(a) Judgment. When any proceeding at law is tried upon the facts by the court, the court at or after the trial shall direct such judgment to be entered as it thinks right upon the evidence and the law. The court shall dictate to the court stenographer, or prepare or file, a brief statement of the grounds for its decision and the method of determining any damages awarded. No requests for instructions and no objections or exceptions to the judgment or to the opinion of the court are required for the purpose of review. * * * (c) Appeal. When a proceeding has been so tried by the court, an appeal from the judgment, if allowed by law, may be taken according to the practice in equity. Upon appeal the Court of Appeals may review upon both the law and the evidence, but the judgment of the trial court shall not be set aside on the evidence, unless clearly erroneous, and due regard shall be given to the opportunity of the trial Court to judge of the credibility of the witnesses. The Court of Appeals may affirm, reverse, modify, or remand, as in appeals from equity."

The following appears in the Explanatory Notes to the General Rules of Practice and Procedure relative to Rule 9, *supra,* at page 2090, 1947 Supplement of the Code: "On the other hand, the parties and lawyers

frequently would like to know briefly at least the considerations on which the trial court decides. This is evidenced by the present rule requiring opinions by the court in equity cases in the counties. Moreover, upon an appeal the opinion of the trial court may be useful in directing the attention of the appellate court to the questions involved in the case and the grounds on which the trial court based its decision. The rule adopted attempts to obtain these advantages without imposing an undue burden on the trial court. It does not require formal findings of fact or conclusions of law; it merely requires the court either to dictate to the court stenographer or to file later a brief statement of the grounds of his decision. Since the court must certainly formulate the grounds on which it acts in reaching a proper decision, the requirement that these grounds be concisely stated should not complicate or delay the proceedings. Yet the brief statement of the court's reasons will better satisfy the parties and counsel and assist the Court of Appeals in case of an appeal."

Here the trial judge plainly stated that the burden of proof was on the plaintiff to prove "a breach of duty or lack of care", on the part of the defendant, "which caused the engine failure". He found that under the evidence offered, even accepting the testimony of Mr. Rook who testified for the plaintiff, plaintiff had not met the burden of proof in showing "any breach of duty or lack of care on the part of Loock and Company". This is a plain statement of the conclusions of the trial judge from the evidence. Here there was no question as to whether the trial judge decided the case on a mixed question of law and fact as in the case of *Feldstein v. Segall*, 198 Md. 285, 81 A. 2d 610. Appellant relies strongly on Rule 52 (a) Federal Rules of Civil Procedure. It is probable that the opinion here would qualify under that rule. *Knapp v. Imperial Oil & Gas Products Co.*, 130 Fed. 2d 1, 3. However it is plain that Rule 9, *supra*, of this Court does not require as much as the Federal rule.

Mr. Sam Jones testified that Mr. Kettle brought the trucks to him. "It was pumping oil. So I took the heads off, and found out it was some burned valves, so I called Loock's man, and he sent someone over, and he miked up the cylinder heads and said it needed the block rebored and new valves. He put new valves in the head, complete unit, rebored the motor in my shop, sends me back the cylinder heads, I set the pistons, the heads, bolted them down and *adjusted the clearance in the valves.*" (Italics supplied.) Mr. Sam Jones did not gauge the clearance between the inside valve cup and the valve stem. He also said after the engines failed he found that the spring valve assembly and tension were wrong. He said he did not send valve cups with the head to Loock and did not get any valve cups back from Loock.

Mr. William Jones, the machine shop foreman for Loock, engaged in the automotive business for twenty-five years, testifying for Loock, said he received orders from Sam Jones for work on the two Brockway motors. He said Sam Jones told them to "rebore it, reface the valves and seats, and when we got the heads into the shop we found the exhaust valves needed replacement and valve guides. So we proceeded along those lines to replace what was needed. * * * We faced the valves and seats. The good ones that could be used we machined them and we replaced the bad valves." He said they reassembled the head just exactly as they took it apart. When asked whether or not the spring seats were interchanged, that is, an intake valve spring seat for an exhaust valve spring seat, he answered: "That could have happened, provided they were that way previous to coming in our shop, because they went back together exactly as they came off." He said no tip cups were sent with the cylinder heads. "Up to now we have yet to get a cylinder head in with the tip cups; all of them come in without the tip cups." He said they had done other jobs on Continental Motors, with valves of this type. "We have done numbers of them

in the same fashion we did the one or two for Sam Jones." After the motors had failed he saw where the spring seats were wrongly assembled.

Mr. Floyd T. Rook, an employee of Brockway Motor Company for thirty-one years, testified for the appellant. He said he examined the four cylinder heads: "They asked me what, in my opinion, could cause the valve to break off. I said it would be hard to determine what would, because there's so many things can take place, but as I examined them I noticed they had the intake keepers on the exhaust springs, which would not permit the keys to go down and release the valves." When asked what would be the probable effect of that kind of assembly, he answered: "It's hard to tell. What could be determined was, what it would do, it would weaken the tension of the valve springs, and it might set up a vibration that would crystalize the valves and cause it to heat up." He further said: "Whether that was the cause of it, it would be hard to say. It is a possibility it will. * * * It is a probability, too." He further said that in order to get the final adjustment it was necessary to set the clearance between the valve stem and cup with a gauge. The gauging could not be done without the cups. He said this gauging is so important he would not accept a job without the cups. All engineers think it dangerous to let a motor go on the street without gauging the clearance. He admitted that if the man at the service station kept the cups he would have to do the assembly job and make the clearance checks.

Mr. Andrew Brezina, an employee of a firm which manufactures automotive valves, and called as a witness by the appellee, said he inspected the motors. In his opinion the interchange of the valves "would have no effect, if as much effect, as failure to adjust the cup clearance." He said "the failure was due to wear and excess clearance increased by wear of tip cups and locks." He said if the gauging had been done in Mr. Jones' shop the excess of clearance would readily have

been noted. When asked: "Is not the proper practice, when such a valve assembly is sent to a filling station to have the tip cup properly placed on it?", he replied: "Only if the tip cup has been sent to outfit that was doing the valve job. Only then could they do the job." He further said: "* * * when he does not send all the parts in question for an assembly that there is a responsibility he must assume of seeing that clearances are correct." He said in his judgment "the failure was due to excessive stress induced by excess of clearance between the top of the valve and the tip cup."

Mr. Willard A. Scranton, a laboratory technician, called by the appellee, said he thought the trouble was caused "by stress, over-stressing, which we normally attribute to improper adjustment of the valve. We have found very seldom do we have failures in these valves as this is worn, which verifies it was caused by large stresses. We usually refer to them as impact stresses, in which the valve is struck and fractures. This failed by repeated stress due to mis-adjustment."

Appellant claims that Mr. Brezina was not qualified to testify with respect to the examination and findings made by him of a valve assembly from one of the motors and his conclusion therefrom. With this contention of the appellant we do not agree. He examined the failed engine and the cylinder heads which had been taken apart at Sam Jones' garage. He was Assistant Chief Engineer of the Service Division of a company which manufactured automotive automobile valves and had been employed by that company for twenty-four years. His testimony was admissible, the weight being a question for the trier of the facts.

There is no evidence here that Loock was instructed to gauge the tip cup clearance, nor is there any evidence that he undertook to do this. If Loock undertook only to rebore the motors, reface the valves and seats and replace what was needed, all of which is shown by the evidence, it was not liable for the failure of the motors

due to neglect in the gauging of the tip cups. *Otis Elevator Company v. Embert,* 198 Md. 585, 84 A. 2d 876.

Of course, negligence on the part of Loock is not presumed and the party alleging such negligence must prove it. In attempting to show that the negligence charged was the proximate cause of the injury, it is not enough for the plaintiff to prove that the negligence might perhaps have caused the failure of the motors. If the injury might have resulted from one of several causes, it is incumbent upon the plaintiff to present proof which will show probability of a cause other than those for which defendant is under no legal obligation. If the cause of the injury to the plaintiff can be as reasonably attributed to a cause for which the defendant is not liable as to one for which he is liable, the plaintiff has not sustained the burden of proving tortious conduct of the defendant. If there is nothing more tangible to proceed upon than two or more conjectural theories, under one or more of which a defendant would be liable and under one or more of which he would not be liable, a jury should not be permitted to speculate how the injury occurred. *Carley v. Allen,* 1948, 31 Wash. 2d 730, 198 P. 2d 827; *Freedman v. Wagner and Karpeles,* 73 Pa. Superior Court, 180; *Russell's Express Inc. v. Bray's Garage, Inc.,* 94 Conn. 520, 109 A. 722; *Cyclopedia of Automobile Law and Practice, Blashfield,* Section 5029. *Garbis v. Apatoff,* 192 Md. 12.

There is no evidence here as alleged in the declaration that the appellee used valves other than those recommended. There is evidence from Mr. Rook that the failure in the motor was probably caused by fault in the assembly of the valves as claimed in the declaration. However, he is not definite about this. He admits that it was necessary to set the clearance between the valve stems and the cups with a gauge, that this is so important that a motor should not go on the street without gauging the clearance, and that the duty to do this gauging is on the man who kept the cups. In this case this was Sam Jones. Mr. Brezina and Mr. Scranton

both testified definitely that the injury was caused by the failure to properly adjust the clearance. There is nothing here to show that Loock undertook to adjust this clearance or that it was its duty to do so. We cannot say that the trial judge was clearly wrong in finding that the appellant had failed to meet the burden of proof against Loock. The judgment will therefore be affirmed.

*Judgment affirmed, with costs.*