405 F.2d 1061
 Treva M. WRATCHFORD, and Thomas N. Berry, Conservators of the Property and Estate of Richard P. Wratchford, Appellants,
v.
S. J. GROVES & SONS COMPANY, a body corporate, and Dale W. Miller, individually and trading as Miller & Greenland, Appellees.
 No. 12140.
 United States Court of Appeals Fourth Circuit.
 Argued June 21, 1968.
 Decided January 8, 1969.
 
 Paul Berman, Baltimore, Md., and Thomas N. Berry, Cumberland, Md. (Melvin J. Sykes, Baltimore, Md., on brief) for appellants.
 Alva P. Weaver, III, and John F. King, Baltimore, Md. (Anderson, Coe & King and Charles B. Keenan, Jr., Baltimore, Md., on brief) for appellees.
 Before HAYNSWORTH, Chief Judge, and BOREMAN and CRAVEN, Circuit Judges.
 HAYNSWORTH, Chief Judge:
 
 
 1
 The principal question presented is whether, in the diversity jurisdiction, federal or state standards are to be applied by the Court in determining the sufficiency of the evidence to go to the jury. We hold that the federal standard applies, and that there was sufficient evidence on the question of proximate causation to go to the jury.
 
 
 2
 Preliminarily, we are met with the objection that the point is not properly before us, because at the time of the trial everyone assumed that the Maryland standard applied. This was understood by the District Court to require that when the evidence shows that the injury could have occurred with equal probability in each of two ways, only one of which would be laid to the defendants' responsibility, it is the duty of the Court to direct a verdict for the defendants.[1] It was on that basis that the District Court directed a verdict in this case, over the protestations of counsel for the plaintiffs that, within the framework of the Maryland rule, the testimony showed that the injury more probably was the result of the defendants' want of due care. There was no suggestion that a federal standard was applicable.
 
 
 3
 After the filing of a notice of appeal, however, the plaintiffs filed a motion, apparently under Rule 60(b) of the Federal Rules of Civil Procedure, contending for the first time that a federal standard controlled, and that it was more liberal from the plaintiffs' viewpoint than the Maryland rule. The District Court did not treat the motion as inappropriate under Rule 60(b). Instead, it had the question fully briefed and argued, after which the motion was denied on the merits. In a memorandum opinion, the District Court reached the conclusion that in the Fourth Circuit a federal standard is to be applied. It also expressed the opinion that, under the applicable rule in this Circuit, there was grave doubt as to the propriety of a direction of a verdict in this case under the federal rule as enunciated in the more recent cases in this Circuit. Despite such doubts, it denied the motion on the merits, with an expression of the appropriateness of this case for clarification of the matter on appeal.
 
 
 4
 No appeal was taken from the denial of the motion, so that, in a technical sense, it is not before us. The fact, however, that the question was belatedly called to the attention of the District Judge and the fact that he chose to consider the matter on the merits and disposed of it with a statement carrying a clear implication of the hope and expectation of appellate consideration of the matter in this case, combine to strongly influence us to notice the claimed error and to reach the merits of the question.
 
 
 5
 Ordinarily, of course, a party should not be allowed to change the theory of his case after trial,[2] but when fundamental rights are involved appellate consideration is appropriate, despite inconsistency in the appellant's position.[3] The right to a jury trial and our traditional faith in the jury's capacity to resolve factual disputes is basic to our federal system of judicial administration.
 
 
 6
 Because of the nature of the question, in light of the post trial proceedings and the District Court's memorandum, we are constrained to reach the merits.
 
 
 7
 On a cold winter morning Richard P. Wratchford, the plaintiffs' conservatee, was found at the bottom of an open highway drainage hole. His skull had been fractured and his body was almost frozen. The cold did not aggravate the injury, however, because it tended to minimize the brain damage. Nevertheless, the brain damage was so extensive that Wratchford suffers from retrograde amnesia, recalls nothing of the circumstances of the injury, and is apparently totally incapacitated.
 
 
 8
 Wratchford had left a union meeting in Cumberland, Maryland, at approximately 10:30 o'clock the night before. Apparently, he proceeded eastward on U. S. Route 40 in the direction of his home, for his car was observed by a patrolman at approximately 11:00 o'clock P.M. parked on the right hand shoulder of the east bound lanes of that road, some five hundred feet west of Wratchford's home. His wife testified that she had requested him to pick up some groceries on his way home, and the articles he wished could be purchased in the office of a motel on the north side of Route 40, opposite where Wratchford's automobile was found. The drainage hole in which he was discovered the next morning and its extended flume were approximately on a line between the motel office and his parked automobile. After his removal from the hole, his car keys were discovered lying at the bottom of the hole. It is, therefore, clearly inferable that Wratchford parked where he did on the shoulder of the west bound lanes and left his car with the purpose of walking across the east bound lanes, the median strip and the west bound lanes to the motel in order to make his purchases, and that he sustained his injury while in that endeavor.
 
 
 9
 Extensive construction work had been underway on Route 40 to convert it from an old two-lane road, one lane in each direction, to a four-lane road, with two lanes in each direction, the east and west lanes being separated by a median strip. The defendant, S. J. Groves & Sons Company, was the general contractor, while the defendant, Miller, was responsible for the construction of the drainage inlets. At the scene of Wratchford's injury, Miller had constructed a "J" inlet in the median strip. It consisted of a concrete flume some twenty-five feet long to carry water into a drainage hole approximately four feet long in an east-west direction parallel to the lanes of traffic, two feet wide and approximately four feet deep. Angle braces had been installed near the top of the hole to form a channel to support a grate. The grate, which, under the contract, was to have been supplied by Groves and installed by Miller, had not been placed. The grate described by the specifications was not one designed for pedestrian traffic, for the bars were placed so widely that a man's foot could pass between them, but, had it been in place, it would not have permitted the leg of a normal adult male to pass into the space between the bars much beyond the knee.
 
 
 10
 The plaintiffs' theory, of course, is that the defendants were negligent in not having placed the grating, which their contract required, or barricaded the hole to warn potential pedestrians of the presence of the open, unprotected hole.[4]
 
 
 11
 On the question of causation, the plaintiffs' theory was that Wratchford stepped into the unprotected hole and sustained the fracture of the left, rear portion of his skull in the resulting fall.
 
 
 12
 The defendants contended that the circumstances gave rise to an inference of equal probability that Wratchford was crossing the median strip at a point somewhat east of the hole, slipped on accumulated ice and snow, which was present in the flume, and slid, slipped or crawled, after his injury, into the hole. Since the District Judge was of the opinion that the injury could have been sustained either way, the one being no more probable than the other, and since, if he sustained his injury on the flume before getting into the hole, the absence of the grate would not have been a proximate cause of the injury, he directed a verdict for the defendants under his understanding of the Maryland rule.
 
 
 13
 Now, as is generally recognized, the question of the applicability of the Erie principle[5] cannot always be resolved by discursive analysis of the rule in question in terms of its being "substantive" or "procedural." Nor is Guaranty Trust's[6] "outcome-determinative" test the appropriate one in selecting the governing rule for the distribution of functions between court and jury.[7] The general approach in Byrd v. Blue Ridge Rural Electric Corp. points to the appropriateness of the use of the federal standard.
 
 
 14
 The Supreme Court has left undecided the question of the standard to determine the sufficiency of the evidence to go to the jury in a diversity case brought in the federal court.[8] What was said in footnote 15 of the Byrd opinion (356 U.S. 525-540, 78 S.Ct. 893, 2 L.Ed.2d 953) was not a final decision of this question. This is indicated by an analysis of Stoner v. New York Life Ins. Co., 311 U.S. 464, 61 S.Ct. 336, 85 L.Ed. 284, which was distinguished in that footnote, for in Stoner the trial was to the court without a jury. It is made clear by the Supreme Court's later explicit reservations of the question in Dick v. New York Life Ins. Co., 359 U. S. 437, 79 S.Ct. 921, 3 L.Ed.2d 935 and Mercer v. Theriot, 377 U.S. 152, 84 S.Ct. 1157, 12 L.Ed.2d 206. The Courts of Appeals are in conflict on the question,[9] but this Court has consistently held that a federal standard is to be applied.[10]
 
 
 15
 In Byrd, the Supreme Court held that in a diversity case in which the defendant claimed the bar of the state's workmen's compensation act, the question of whether the plaintiff was the defendant's employee within the meaning of the compensation act was for the jury, notwithstanding the state rule that the question of employment relationship was for the court. Mr. Justice Brennan said for the Court:
 
 
 16
 The federal system is an independent system for administering justice to litigants who properly invoke its jurisdiction. An essential characteristic of that system is the manner in which, in civil common-law actions, it distributes trial functions between judge and jury and, under the influence — if not the command — of the Seventh Amendment, assigns the decisions of disputed questions of fact to the jury [citation omitted]. The policy of uniform enforcement of state-created rights and obligations, see, e. g., Guaranty Trust Co. of New York v. York, supra, cannot in every case exact compliance with a state rule — not bound up with rights and obligations — which disrupts the federal system of allocating functions between judge and jury.[11]
 
 
 17
 An equally grave disruption of the federal system would result from the application of state law rules as to the sufficiency of evidence to go to the jury. Indeed, it has been suggested, not without reason, that the Seventh Amendment commands application of federal rather than state law here.[12] Faith in the ability of a jury, selected from a cross-section of the community, to choose wisely among competing rational inferences in the resolution of factual questions lies at the heart of the federal judicial system. That faith requires consistency within the system and does not permit the accommodation of more restrictive state laws.
 
 
 18
 As in Byrd, the rule as to the sufficiency of the evidence is not bound up with the primary rights and obligations of the parties. In a diversity case, state law defining and limiting those primary rights and obligations must be applied under the Erie doctrine, enabling members of society prudently to plan and conduct their affairs, whether their conduct will later be called into question in a state or a federal court. A choice of a rule as to the quantum of proof necessary to support the submission of a case to a jury plays no role in the ordering of the affairs of anyone. It is not the kind of rule which must inexorably find its governance in a diversity case in the corpus of state law. Indeed, unless one accepts the "outcome-determinative" test as both inflexible and universal, there is little in this situation to support the choice of the state rule as opposed to the federal.
 
 
 19
 For such reasons and in keeping with Byrd's concern for the perpetuation of an independent federal judicial system through maintenance of those rules fundamental to it, we adhere to our earlier holdings that the federal standard was the appropriate one for application here.
 
 
 20
 The federal standard may once have been the same as that which the District Court understood was applicable in the state courts of Maryland,[13] but it no longer is.[14] In Ford Motor Co. v. McDavid, 4 Cir., 259 F.2d 261, 266, we expressed it in the following language:
 
 
 21
 The old notion that a jury should not be allowed to draw any inference from circumstantial evidence, if the one is as probable as the other, has fallen into discard and has been replaced by the more sensible rule that it is the province of the jury to resolve conflicting inferences from circumstantial evidence. Permissible inferences must still be within the range of reasonable probability, however, and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture.
 
 
 22
 The relevant question, therefore, is not whether the judge is of the opinion that the evidence did not make it more probable than not that Wratchford stepped into the hole before his skull was fractured, but whether a jury might reasonably conclude from the evidence that that inference was more probable than the inference of an earlier injury as a result of a slip on ice in the flume. It is true, of course, that somewhere lines must be drawn by a federal judge, for if the inference sought to be drawn lacks substantial probability, any attempted resolution of the question may well lie within the area of surmise and conjecture. Had Wratchford's body and car keys not been found in the hole, had there been no stains on the side of the hole near where his head was, stains believed to have been blood, the probability that he received his injury as a result of a step into the hole may have been so slight as to require the direction of a verdict for the defendants. The probability that he received his injury as a result of a step into the hole is here, at least, equally as great as the probability that he was injured before entering the hole, and the situation is not complicated by a multitude of other competing inferences, the existence of which would diminish the probability of the injury's having been sustained in the manner the plaintiffs' theory suggests.
 
 
 23
 The jury, of course, should be instructed that in order to carry the burden of proof the plaintiffs must persuade them by the preponderance of the evidence that the injury was sustained as a result of a step into the hole rather than in an earlier fall on the ice, but that simply leaves, under appropriate instructions as to the burden of proof, the choice of the two competing inferences to the jury. Termination of the case by the court upon its appraisal of the two conflicting inferences as equally probable was a violation, we think, of the federal standard and the province of the jury, for either inference is not so tenuous that reasonable men might not embrace it. Indeed, when a district judge is confronted with only two conflicting inferences, each of which he regards as equally probable, and there is no other possible explanation of the event, that, itself, strongly indicates that other judges and other reasonable men might rationally regard the one inference as more probable than the other.
 
 
 24
 We conclude that the case should have been submitted to a jury under appropriate instructions as to the defendants' negligence and its proximate relation to the injury.
 
 
 25
 Nevertheless, the defendants ask that we affirm the judgment on the ground that Wratchford's failure to use the nearby paved cross-over to drive his automobile or to walk into the grounds of the motel was contributory negligence as a matter of law. The question we regard as a close one, despite the District Court's expressed view that this issue was one for the jury. The answer, however, is so much dependent upon nuances in the evidence as to weather and surface conditions at the time and inferences as to Wratchford's knowledge of them that we decline the invitation. That is not to say, however, that, on a retrial, the District Court will be foreclosed from consideration of this issue as presented on the new record.
 
 
 26
 The defendants next contend that any duty owed by them to the public terminated upon acceptance by the state of the road for maintenance. It is far from clear, however, that the State Roads Commission accepted the work without conditioning its acceptance upon the prescribed placing of the grate over the drainage hole in question.[15] Mr. George E. Geary, Assistant District Engineer for the Commission, stated on direct examination: "* * * [W]e have no specification as to when the grate is placed. Our only requirement is that it be placed prior to final acceptance of the contract." As for the letter from the Commission to Groves of December 21, 1961, accepting the contract for maintenance, Mr. Geary testified: "It included all of the items which had been completed in accord with the specifications, with the exception of these items which were not, and any other thing which had not been completed according to inspection." The letter, itself, reads in part as follows:
 
 
 27
 There are a number of minor items to be completed before a final inspection can be made. However, due to the present weather conditions, it has been agreed that those items will be completed as soon as weather permits. We will, however, accept this contract for maintenance, effective this date, and expect your organization to complete the remainder of this work as soon as practical.
 
 
 28
 It is true that the follow-up letter to Groves listing the items still to be completed made no mention of the missing grate, but this is not conclusive on the question of unconditional acceptance of the work on the inlet. Mr. Footen, the actual road inspector for the Commission, had not reported the missing grate to the main office whence the letter came, but Groves' foreman on the job knew as late as December 24 that the grate had not been placed and that Mr. Footen expected it to be placed as specified. Under these circumstances the finder-of-fact would not be foreclosed from concluding that the inlet was not finally accepted for maintenance until the work specified by the contract was completed.
 
 
 29
 Finally, defendant Miller contends that even if plaintiffs overcome the obstacles set up by defendants above, Miller cannot be found liable. The sub-contractor argues that there was no evidence that he created the condition of potential danger; that his sole duty was to place over the drainage hole a grate which Groves was obligated to supply and which Groves had failed to supply by the time of the injury to Wratchford. Furthermore, Miller had no contractual duty to cover inlets for which grates were not provided or to erect barricades or other warning signals around such inlets and no evidence was presented to show that Miller had not relinquished control of the inlet in question by the time of the injury. It is Miller's position that under such circumstances he cannot be held to have owed a duty to Wratchford. Even if we assume the facts to be as Miller contends, however, it is not clear that liability is foreclosed. The answer, of course, depends upon the law of Maryland, and it is not inconceivable that a state might hold that one relinquishing control over a situation of reasonably foreseeable danger has a common law duty to obviate the danger when it appears that the party contractually charged with the duty has been neglectful of it. We are of the opinion that the District Judge sitting in Maryland and familiar with the laws of that state is best suited to wrestle initially with the difficult question of what the state law is in this area.
 
 
 30
 Accordingly, for the reasons stated above, the case is reversed and remanded.
 
 
 31
 Reversed and remanded.
 
 
 
 Notes:
 
 
 [1]
 Langville v. Glen Burnie Coach Lines, Inc., 233 Md. 181, 195 A.2d 717; Kettle v. R. J. Loock & Co., 199 Md. 95, 85 A. 2d 459
 
 
 [2]
 Holm v. American Ship Building, 6 Cir., 276 F.2d 201; Autrey v. Williams and Dunlap, 5 Cir., 343 F.2d 730; City of Memphis v. Southern Bell Telephone, 6 Cir., 316 F.2d 535; Pellerin Laundry v. Reed, 8 Cir., 300 F.2d 305; VanHuffel v. Harkelrode, 284 U.S. 225, 52 S.Ct. 115, 76 L.Ed. 256
 
 
 [3]
 5 Moore's Federal Practice ¶ 46.02, p. 1904; Sibbach v. Wilson & Co., Inc., 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479; Chagas v. Berry, 5 Cir., 369 F.2d 637
 
 
 [4]
 There were other items uncompleted in the construction work. The work had been closed down for the winter, however, and the west bound and east bound lanes were open for traffic
 
 
 [5]
 Erie Railroad v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188
 
 
 [6]
 Guaranty Trust Co. v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079
 
 
 [7]
 See Byrd v. Blue Ridge Rural Electric Corp., 356 U.S. 525, 78 S.Ct. 893, 2 L. Ed.2d 953; Hanna v. Plumer, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8
 
 
 [8]
 See Dick v. New York Life Ins. Co., 359 U.S. 437, 444-445, 79 S.Ct. 921, 3 L.Ed. 2d 935; Mercer v. Theriot, 377 U.S. 152, 156, 84 S.Ct. 1157, 12 L.Ed.2d 206
 
 
 [9]
 See 5 Moore's Federal Practice ¶ 50.06 at pp. 2348-49, and cases cited therein; 2B Barron & Holtzoff (Wright ed.), § 92 nn. 14.16, 14.17
 
 
 [10]
 Gorham v. Mutual Benefit Health and Accident Assoc., 114 F.2d 97; Crockett v. United States, 116 F.2d 646; McSweeney v. Prudential Ins. Co., 128 F.2d 660, cert. den., 317 U.S. 658, 63 S.Ct. 57, 87 L.Ed. 529; Davis Frozen Foods v. Norfolk-So. Ry., 204 F.2d 839, cert. den., 346 U.S. 824, 74 S.Ct. 41, 98 L.Ed. 349; Burcham v. J. P. Stevens, 209 F.2d 35; Summers v. Watkins Motor Lines, 323 F. 2d 120; Pinchurst v. Schlamowitz, 351 F.2d 509
 
 
 [11]
 356 U.S. 525, 537-538, 78 S.Ct. 893, 901
 
 
 [12]
 See Wright, Federal Courts, pp. 351, 352
 
 
 [13]
 See Pennsylvania R.R. v. Chamberlain, 288 U.S. 333, 339, 53 S.Ct. 391, 77 L.Ed. 819
 
 
 [14]
 See Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916, a F.E.L.A. case, which without expressly overrulingChamberlain prescribes a very different standard. It has been accepted as establishing the standard for use in diversity cases. See Planters Mfg. Co. v. Protection Mut. Ins. Co., 5 Cir., 380 F.2d 869; NLRB v. Marcus Trucking Co., 2 Cir., 286 F.2d 583; Baltimore & O. R.R. v. Poston D.C.Cir., 177 F.2d 53; Preston v. Safeway Stores, Inc., D.D.C., 163 F. Supp. 749, aff'd on other grounds 106 U. S.App.D.C. 114, 269 F.2d 781. See also, Moore v. Guthrie Hospital, Inc., 4 Cir., 403 F.2d 366. But see Jellison v. Kroger Co., 6 Cir., 290 F.2d 183.
 
 
 [15]
 This is not to suggest that a finding of unconditional acceptance would necessarily terminate any duty owed by defendants. The law in this area is in a state of flux, see Prosser, Torts, 3d ed., § 99, pp. 693-696, and diligent inquiry into the state of the Maryland law in this area would be necessary to a resolution of the question