869 F.2d 594
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Keith A. JOHNSON, Plaintiff-Appellee,
v.
CITY OF CHARLOTTE, NORTH CAROLINA, Defendant-Appellant.
 No. 88-3031.
 United States Court of Appeals, Fourth Circuit.
 Argued: Nov. 4, 1988.
Decided: Feb. 3, 1989.
 
 John West Gresham (Ferguson, Stein, Watt, Wallas & Adkins, P.A.; Randolph B. Means, Police Attorney, on brief), for appellant.
 Louis L. Lesesne, Jr. (Gillespie, Lesesne & Connette, on brief), for appellee.
 Before K.K. HALL and JAMES DICKSON PHILLIPS, Circuit Judges, and DENNIS R. KNAPP, Senior United States District Judge for the Southern District of West Virginia, sitting by designation.
 JAMES DICKSON PHILLIPS, Circuit Judge:
 
 
 1
 Plaintiff Keith A. Johnson is a member of the Police Department of the City of Charlotte, North Carolina. Johnson is white. He applied for but was denied assignment to an open position in the department's helicopter observation unit. Johnson later learned that the department had assigned Samuel Brown, Johnson's black colleague, to fill the open position. Claiming that he was the more qualified candidate, Johnson subsequently brought this "reverse discrimination" claim against the City under 42 U.S.C. Sec. 1983. The case proceeded to trial, and a jury returned a verdict in favor of Johnson, awarding him $25,000 in compensatory damages. Finding no merit in the City's claims on appeal that the district court erred in giving a sua sponte jury instruction over the objection of both parties, and that the court should have directed a verdict in favor of the City, we affirm.
 
 
 2
 * The history behind Johnson's Sec. 1983 claim is not remarkable. Certain aspects of the trial of this action, however, were somewhat more unusual. We begin with the former.
 
 
 3
 * In July of 1986, the Charlotte police department's helicopter unit solicited applications from within the department for two open positions as an in-flight "observer." Officers assigned to the helicopter unit were to receive no additional pay or benefits, and the department did not consider assignment to the unit a "promotion." A written job description for the position indicated that prior aviation experience was not a prerequisite for assignment to the unit as an observer. The department nevertheless asked applicants to note any such experience on their resumes. The formal job announcement also noted a "preference" for applicants with "pilot airframe certifications," "power plant ratings" or "motorcraft experience."
 
 
 4
 The announcement piqued the interest of both Johnson and Brown. Johnson had a pilot's license and a longstanding interest in aviation. Brown had served for some time as an observer in a military helicopter observation unit. Both men applied for assignment to one of the two open positions, as did twelve of their colleagues.
 
 
 5
 The helicopter unit supervisor, Sergeant Williams, performed the initial screening and background investigations of the applicants. Williams created a chart reflecting what he considered to be the "necessary" objective qualifications of a helicopter observer, including prior aviation experience. The chart also accounted for certain subjective selection criteria, including scaled evaluations solicited by Williams from each applicant's immediate supervisor. The chart did not, however, reflect certain qualifications which departmental regulations listed as "relevant." It did not, for example, account for applicants' prior law enforcement experience with other agencies, promotions records, awards or citations, or prior "special assignments."
 
 
 6
 On the basis of his chart, Williams rated the fourteen candidates in a memorandum to his superior, Captain Glenn. Williams ranked an Officer Nowland first on his list, plaintiff Johnson second, and Officer Brown fourth. Williams later met with Captain Glenn and Glenn's immediate supervisor, Assistant Chief Eidson, to discuss which applicants should be selected for the two open positions. On the basis of his memorandum to Glenn and his chart of the applicants' relative qualifications, Williams initially recommended Officers Nowland and Johnson. Eidson apparently told Williams that Nowland was an acceptable candidate for one of the observer positions, but that Williams would have to choose one of the two black officers on his list for the second opening. Williams indicated a preference for Officer Brown.
 
 
 7
 Eidson subsequently reviewed the applicants' files independently and decided to adopt Williams' ultimate recommendation that Nowland and Brown be selected for the observer positions. He forwarded Williams' recommendation and his own to Chief of Police Killman, who was responsible for all final assignment decisions. Killman also reviewed each applicant's file and ultimately selected Nowland and Brown. Killman testified at trial that, at the time he made his final decision, he was not aware that Eidson had asked Williams to recommend at least one black officer for a position in the helicopter unit.
 
 
 8
 When the assignments were announced, Johnson protested and met with Captain Glenn to discuss the selection process. Glenn allegedly told Johnson that
 
 
 9
 [t]he chief feels like we need to put a black up there. We have an affirmative action program, and the chief feels that one of the subjects and one of the applicants needs to be black.... You would have gotten the job if ... the only thing we were looking at, was qualifications, but we do have this affirmative action plan.
 
 
 10
 Joint Appendix at 110-11. At a later meeting, however, Glenn apparently attempted to convince Johnson that Brown was in fact the better qualified candidate, especially in light of Brown's prior military experience as a helicopter observer. Unsatisfied with Glenn's explanation, Johnson later met with Eidson, who justified the department's selection of Brown over Johnson on the grounds that Brown "had some observer time and because of affirmative action." Id. at 115. When the department ultimately refused to reconsider its assignments of Nowland and Brown to the helicopter unit, Johnson filed this lawsuit, charging the City with unlawful race discrimination.
 
 B
 
 11
 At trial, the City ultimately sought to defend on two theories: first, that Brown was simply the more qualified candidate, and that Chief Killman's assignment decision was not motivated by race; and second, that even if race was a motivating factor in the ultimate assignment decisions, the City was legally entitled to attempt to achieve "racial diversity" at all levels of its police department.
 
 
 12
 By agreement of the parties, the City had abandoned a third theory on which it originally intended to rely. The circumstances under which this occurred and the unexpected procedural consequences that ensued provide the principal issue on this appeal.
 
 
 13
 On January 9, 1974, the same district judge who later would preside over the trial in this case had entered a consent decree in another case, North State Law Enforcement Officers Association v. City of Charlotte, C/A No. 2938 (W.D.N.C. Jan. 9, 1974). The consent decree is still in effect. Paragraph seven of that decree provides that, "[c]onsistent with the manpower needs of the [City's] Police Department and the assignment of officers to positions to [sic] which they are most qualified, the Police Department shall endeavor to assign qualified black officers to divisions, units, bureaus and sections to which they have not been assigned in the past." Id., slip op. at 3. In the present case, the City originally planned to defend on the alternative basis that, "even if Brown were not the better qualified candidate, the City had a duty under the consent decree to place qualified black officers in units such as the helicopter unit which had not previously had a black officer." Appellant's Brief at 8. The City sought to abandon this theory, however, in return for the plaintiff's agreement not to introduce evidence or argue that, under controlling precedent, the City was not legally entitled to rely on the 1974 consent decree.
 
 
 14
 The presiding judge understandably was troubled, however, by the parties' effort to take this issue out of the case by effectively ignoring the still-operative consent decree. At the close of evidence the judge conducted an extensive in-chambers charge conference with counsel principally centered on the import and effect of the 1974 North State consent decree. See Joint Appendix at 247-64 (Transcript of In-Chambers Conference). In response to the judge's assertion that the parties had tried the case on a "false" theory, and his suggestion that he would sua sponte instruct the jury that the City was legally obligated to comply with the North State order, counsel for both parties strenuously objected that they had agreed not to raise the consent decree as an issue going to the City's ultimate liability on Johnson's claim. They insisted that the jury could and should be allowed to decide the case without considering the effect, if any, of the 1974 order on the City police department's helicopter unit assignment decisions.
 
 
 15
 The judge strongly disagreed, indicating his unwillingness to leave the jury unaware of the fact that the police department was "doing what the Court has been telling them to do for fourteen years." Joint Appendix at 253. The judge concluded that in the interests of justice he must enter a copy of the consent decree into evidence and instruct the jury on the "consent decree defense" which the City had decided to abandon. Both parties entered formal objections to such an instruction.
 
 
 16
 The judge did as he proposed and ultimately charged the jury as follows:
 
 
 17
 There is one consideration which you may take into account, and that is, that there was an Equal Employment Protection Plan in effect at the police department when this was going on, which was adopted under a Court Order some twelve or thirteen years ago, and under that plan, an agreement had been reached which reads this way:
 
 
 18
 "Consistent with the manpower needs of the police department and its assignment of officers to positions in which they are most qualified, the police department shall endeavor to assign qualified black officers to divisions, units, bureaus and sections to which they have not been assigned in the past."
 
 
 19
 This was an agreement made between the City and the Court in 1984--or '74. The defendants have made very little point of that in the trial. They have asserted the same thing in other ways and have taken the view that they felt it appropriate to have multi-racial participation in all the various departments of the police administration. You are to take into account all of these reasons asserted by the defendant.
 
 
 20
 Id. at 359-60. The jury returned a verdict in favor of the plaintiff and awarded Johnson $25,000 in compensatory damages.
 
 
 21
 The City now seeks reversal and remand for a new trial on the grounds that, notwithstanding the "defense-oriented" nature of the judge's unsolicited instruction, "instructing the jury on the consent judgment was extremely prejudicial to the City." Appellant's Brief at 11. The City argues that its trial strategy was to attempt to convince the jury that race was not a motivating factor in Chief Killman's helicopter unit assignment decision; that it introduced evidence which might have convinced the jury that Officer Brown was simply more qualified than Officer Johnson; and that the court's reference to the consent decree improperly cast doubt on the credibility of the City's evidence by raising an inference, which the City itself sought to avoid, that the assignment decision was indeed racially motivated. "[T]he decision by the court to interject the Consent Degree [sic] into the trial could only leave the jury with the distinct impression that in fact, as Plaintiff had argued, race had been a motivating factor for Chief Killman's assignment decision." Id. at 12.
 
 
 22
 The City also presses two other claims: (1) that the district court should have directed a verdict for the defendant because Johnson failed to present sufficient evidence that he was the "more qualified candidate"; and (2) that the City is entitled to a new trial on the issue of damages because Johnson failed to introduce sufficient evidence of actual compensable injury to justify the jury's ultimate award.
 
 II
 
 23
 We first consider the City's claim that the district court's sua sponte jury instruction was prejudicial error. The City relies primarily on the rule that "[i]t is the duty of the trial court to instruct the jury on issues raised by the pleadings and supported by the evidence and nothing more." Radio Corp. of America v. Radio Station KYFM, Inc., 424 F.2d 14, 19 (10th Cir.1970). The general proposition is of course accurate: it is error for a trial court to charge the jury on theories of the case which are unsupported by evidence in the record. See, e.g., Neubauer v. City of McAllen, 766 F.2d 1567, 1575 (5th Cir.1985); Smith v. FMC Corp., 754 F.2d 873, 877 (10th Cir.1985); Ware v. Reed, 709 F.2d 345, 352 (5th Cir.1983); Guilford Nat'l Bank of Greensboro v. Southern Ry., 319 F.2d 825, 827 (4th Cir.1963). But it assumes that there is not such evidence. Cf. 9 C. Wright & A. Miller, Federal Practice and Procedure Sec. 2556, at 661-62 (1971) (rule that instructions must conform to the pleadings and evidence is "not literally accurate"; for example, if issue "has in fact been tried, though not raised in the pleadings, the pleadings are deemed amended to conform to the evidence and an instruction on that issue is required"). In this regard, the City claims that the jury heard no evidence with respect to the relevant decision-makers' purported duty to comply with the terms of the North State consent decree.
 
 
 24
 The record reveals, however, that two defense witnesses testified explicitly that, in connection with their role in the helicopter unit assignment decisions, they considered the effect of the City's obligations under the 1974 order. Assistant Chief Eidson, for example, testified that he had instructed Sgt. Williams to "consider any minority candidates because at the time, and since 1974, the police department had been under a Court Order or Court Decree to consider minorities for promotions and specialized assignments." Joint Appendix at 190. Similarly, when asked if "racial considerations" ever entered his mind when he made personnel decisions, Chief Killman responded affirmatively. When asked why, Killman responded that "[w]e ... are under a consent decree with the Court, have been for, I guess, about fifteen years, which pretty much requires" that the department "give adequate and careful consideration to all minorities." Id. at 228. In the face of this testimony, we conclude that the "theory of the case" embodied in the disputed instruction had at least the requisite evidentiary support to justify its submission to the jury.
 
 
 25
 The City would nevertheless have us broaden the rule on which it relies and hold that it is error for trial courts to instruct juries with respect to any theory on which the parties have decided, for strategic reasons, not to rely. In related fashion, the City argues that it is presumptive error for a court to give an instruction over the objections of both parties to the lawsuit. The question is novel and implicates many of our traditional notions about the adversarial system and the respective roles of courts, counsel and juries in that system. We need not explore all the implications, however, for we conclude that the disputed jury instruction, even if given in "error," was not prejudicial. See 28 U.S.C. Sec. 2111; see generally Fed.R.Civ.P. 61; McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 553-54 n. 4 (1984). "The test for harmlessness ... is whether it is probable that the error could have affected the verdict reached by the particular jury in the particular circumstances of the trial." United States v. Davis, 657 F.2d 637, 640 (4th Cir.1981).
 
 
 26
 In the present case the crux of the City's argument is that the court's sua sponte instruction improperly raised inferences wholly at odds with the City's considered trial strategy--namely, an attempt to prove that race was simply not a factor in the police department's decision to assign Officer Brown, rather than plaintiff Johnson, to the open position in the helicopter unit. In turn, the City claims that the instruction, while cast in terms apparently favorable to the defense, undermined the credibility of independent evidence which might have led the jury to a different conclusion than it ultimately reached.
 
 
 27
 We are persuaded, however, that the City raised the purportedly prejudicial inferences itself by asserting--whether or not by inadvertence--the alternate defense that police department officials were legally entitled to take race into account in making personnel decisions, in an attempt to achieve racial diversity at various levels of the police bureaucracy. The City itself requested that the court give the following jury instruction:
 
 REQUEST NO. 4A
 
 28
 Evidence that the City, and its decisionmakers, would like to achieve racial diversity in various work areas and assignments in the Police Department is not proof of invidious discriminatory purpose or intent. It is not necessarily unlawful for the Police Department's decisionmakers to consider the advantages of racial diversity in the workplace. Racial diversity in the workplace can be a legitimate, non-discriminatory, interest of the City justifying individualized consideration of a candidate's race, along with all other relevant factors.
 
 
 29
 Joint Appendix at 88. The court ultimately read this requested instruction to the jury not once but twice. Id. at 357-58, 361. As indicated, whether or not intended, this instruction had ample support in the evidence, most notably in the testimony of Eidson and Killman.
 
 
 30
 The requested instruction did not, of course, embody precisely the same theory as did the court's unsolicited instruction on the 1974 consent decree. For all practical purposes, however, the requested instruction clearly had the same net effect. It would, no doubt, have permitted precisely the same inferences in the minds of the jury as did the court's sua sponte instruction, which the City now claims hopelessly prejudiced and compromised its trial strategy. In the end, the City claims no more than that the court's unsolicited instruction cast doubt on the City's assertion that the police department conducted a race-neutral selection process for the purpose of filling the open positions in the helicopter unit, at least in its implication that race was a relevant consideration. Yet the instruction requested by the City just as strongly suggests that the assignment decision may have been made on justifiable racial grounds. The point is that both instructions implied that it was permissible for the department to consider race, hence that race was in fact considered. As a simple matter of logic, the City cannot now claim that one instruction, which it did not request, was prejudicial and at the same time argue that the other, which it sought, was perfectly harmless. We cannot, therefore, say that it is "probable" that the court's unsolicited instruction on the City's obligations to comply with the North State consent decree affected the jury's verdict against the City. Davis, 657 F.2d at 640.*
 
 III
 
 31
 We turn briefly to the City's claim that the trial court should have directed a verdict on the liability issue because Johnson presented insufficient evidence that he was more qualified for the open position in the helicopter unit than Officer Brown.
 
 
 32
 We agree with the district court's conclusion that there was substantial evidence presented at trial from which the jury reasonably could have concluded that Johnson was more qualified than Brown. See Wratchford v. S.J. Groves & Sons Co., 405 F.2d 1061, 1066 (4th Cir.1969). Sgt. Williams' original evaluation rated Johnson the more qualified candidate. Captain Glenn apparently accepted this evaluation, although he and Williams both later recommended Brown. Johnson had a better performance and absentee record, while Brown had been officially reprimanded four times in the previous year. In response to Sgt. Williams' request that each applicant's supervisor submit a written evaluation and rate his subordinate on a "1-to-10" scale, Brown's supervisor gave him a "5," while Johnson's supervisor rated him an "8."
 
 
 33
 There was, of course, substantial countervailing evidence in the record, but it suffices that a reasonable jury might well have concluded on the evidence adduced that Johnson was more qualified than his colleague for the open position in the helicopter unit.
 
 IV
 
 34
 We turn finally to the City's claim that the jury's award of $25,000 in compensatory damages was wholly unsupported by any evidence of "injury" proximately caused by the department's selection of Brown over Johnson. The City assigns as error the district court's refusal to set aside the verdict as excessive and seeks remand for a new trial on the damages issue.
 
 
 35
 Our standard of review of trial courts' refusals to set aside damage awards as excessive is highly deferential.
 
 
 36
 A trial court in its discretion may set aside a verdict and grant a new trial if the "verdict is so excessive that it cannot be justified by anything in the record or of which the Court can take judicial notice[.]" Virginian Railway v. Armentrout, 166 F.2d 400, 407 (4th Cir.1948). Our review of the trial court's decision, however, "is limited to ascertaining whether the decision amounts to an abuse of discretion." Occidental Life Ins. Co. v. Pat Ryan & Assoc., 496 F.2d 1255, 1264 (4th Cir.1974).
 
 
 37
 Klein v. Sears Roebuck & Co., 773 F.2d 1421, 1428 (4th Cir.1985). Here, the direct evidence of damages was concededly thin. Johnson would not have received any additional pay or benefits had he been assigned to the helicopter unit. He testified only briefly and vaguely with respect to generalized anxiety and distress over his failure to obtain an assignment as an observer. It is for the jury, however, to assess the credibility of such testimony--which is often all that is available--and to award appropriate damages. The City would have us compare the damages awarded here to the jury awards in other cases; but we need say only that such comparisons are futile. The damages which the jury awarded in this case may well have been generous, but we cannot say that, for reasons which manifestly appear in the record, they were so outrageous that the district court abused its discretion in refusing to set them aside.
 
 V
 
 38
 For the foregoing reasons, the judgment of the district court is affirmed.
 
 
 39
 AFFIRMED.
 
 
 
 *
 Affirming on this basis does not require us to consider whether, if properly advanced by the City, the 1974 consent decree could operate as an effective defense to this or comparable "reverse discrimination" actions. On that question, we express no opinion. We hold only that without regard to the possible merits of such a defense, its unsolicited injection by the court in this case cannot be considered prejudicial to the City